[Civ. No. 19929. Fourth Dist., Div. Two. Aug. 24, 1979.]

MARGARET BAKER et al., Plaintiffs and Appellants, v.
BEECH AIRCRAFT CORPORATION, Defendant and Respondent.

COUNSEL

Magana, Cathcart & McCarthy, James J. McCarthy, John M. Dillard and Michael D. Moorhead for Plaintiffs and Appellants.

Kirtland & Packard, Robert C. Packard and Joseph E. Gregorich for Defendant and Respondent.

OPINION

McDANIEL, J.—A Beech Bonanza aircraft crashed on October 16, 1968, near Las Cruces, New Mexico, killing two persons, including the pilot, and severely injuring a third whose legs eventually had to be amputated. The underlying litigation was brought by the families of the two decedents and the survivor of the crash (plaintiffs) against the manufacturer of the Bonanza, Beech Aircraft Corporation (defendant), on the alleged theory that the crash was the result of defectively designed fuel tanks.

The action was filed substantially more than one year after the date of the crash, and after successive efforts to amend to avoid the bar of the statute of limitations, the trial court sustained without leave to amend defendant's demurrer to plaintiffs' third amended complaint.

Plaintiffs' appeal from the judgment of dismissal which followed the successful demurrer noted was dealt with by this court in *Baker* v. *Beech Aircraft Corp.,* 39 Cal.App.3d 315 [114 Cal.Rptr. 171, 91 A.L.R.3d 981], and therein we reversed the trial court. We held that plaintiffs had

effectively pleaded facts,[1] *which if proved,* would have tolled the statute of limitations and that therefore, for purposes of demurrer, the action had been timely filed after discovery of the purported fraud. (*Id.,* at p. 325.)

After the reversal noted, and when the case came on for trial, the trial court granted defendant's motion to bifurcate, more particularly to try first the special affirmative defense of the statute of limitations. As a consequence, the ultimate issue presented for determination by the jury in this current phase of the case was whether the statute of limitations began to run more than one year before May 24, 1972, the date on which the action was filed, i.e., whether the statute was tolled to a time after

---

[1]The key allegations were that:

"The defendants and each of them prior to and subsequent to the subject accident continued to represent to the Federal Aviation Administration, to the public, to users of its aircraft, and to plaintiffs herein that the 40 gallon fuel system contained in said aircraft was safe, fit, free of defects, met minimum Federal standards and was in all respects airworthy. No literature or warning was ever furnished by defendants to the users of its aircraft including plaintiffs herein of the dangers inherent in the fuel system of said aircraft, and at all times prior to approximately 30 days before the filing of their original complaint herein, plaintiffs did not know or suspect or have reason to know that the said crash was caused by the defective, unsafe and unairworthy fuel system contained in said aircraft.

"The representations made by defendants and each of them as specified above were false at the time they were made and defendants knew said statements were false but nevertheless made such misrepresentations with the intent to induce persons to purchase, operate and occupy their aircraft and with the further purpose of avoiding claims for damages for injury or death due to the above mentioned defects. At all times during which said misrepresentations were made to the general public including plaintiffs herein, defendants had actual knowledge as a result of flight tests performed by defendant Beech personnel that said 40 gallon fuel system was unsafe, unairworthy and unreasonably dangerous for the use intended and despite such knowledge intentionally and falsely failed to warn users of its aircraft and the public generally of the danger and risk of using said aircraft containing the defective fuel system.

"That the fuel starvation defect which is the subject matter of this litigation is not the type of defect which ordinarily would be discovered by examination of the aircraft wreckage. That said defect cannot be found without the performance of elaborate and extensive tests being made by experts under scientifically controlled conditions on the ground and in the air.

"Plaintiffs, and each of them, relied upon the fraudulent misrepresentations of the defendants as mentioned above and further were unable to obtain information concerning the facts of this accident from the investigators of the National Transportation Safety Board until approximately July of 1969 when the National Transportation Safety Board report became available to members of the public (14 C.F.R. 400, 401 and 435). That the finding of probable cause by the National Transportation Safety Board was not available to plaintiffs herein until approximately one year after the subject accident. That because the defendants had actually concealed the existence of such defect and denied its existence, at a time when they knew of the nature and existence of such defect, the National Transportation Safety Board had not considered the above mentioned defect and concluded that the probable cause was 'power plant failure for undetermined reasons.' "

These somewhat hyperbolic allegations have been set forth at length because they are in marked contrast to what the evidence actually showed.

May 24, 1971. Thus, the purpose of the trial was to test the validity of the allegations noted in the margin with reference to events occurring on or before May 24, 1971.

At the outset of the trial and during opening statements by counsel, a stipulation was read to the jury which related, "[p]laintiffs contend that a defect in the fuel system of the S-35 Bonanza aircraft involved in this case caused this accident. This alleged defect is known as unporting of fuel and results in fuel starvation to the aircraft's engine. [¶] The subject of the unporting will be explained to you during the presentation of evidence. Beech denies that any alleged defect caused the accident, but for the purpose of deciding the issues that will be presented to you in this trial, you may assume that the Plaintiffs' contention as [to] the cause of the accident is correct." Thereafter, the trial proceeded for 45 days, and at the trial's conclusion the jury brought in a verdict for defendant. The plaintiffs appealed.

### ISSUES AND DISCUSSION

The theory upon which plaintiffs undertook to make a case for tolling the statute of limitations was that defendant, while being well aware of the purported defect in the design of the fuel tanks installed in the crashed Bonanza, fraudulently misrepresented to and concealed material facts from the public and the Federal Aviation Administration (FAA) with reference thereto. Plaintiffs allege that these misrepresentations and concealments were such as to prevent plaintiffs, as members of the public, from "discovering" that they had a cause of action until they read an article, appearing in the July 30, 1971, issue of the Wall Street Journal, brought to their attention by friends about 30 days before the action was filed.

However, the assignments of error on appeal are only peripheral in terms of the actual evidence offered by both sides on the fraudulent misrepresentation and concealment issue.[2] More particularly, plaintiffs

---

[2]In this connection there was substantial if not overwhelming evidence in the record that defendant had neither made misrepresentations nor concealed anything concerning the "unporting" phenomenon. At the trial, defendant called retired FAA employee George Wells, who had been the project engineer for Beech airplanes at the FAA's Central Region in Kansas City, Missouri, and later the chief of all powerplant specialists, with supervisory control over the FAA's Beech project engineer. When working for the FAA, Wells had personally authored or initialed many of the letters flowing between defendant and the FAA which had been introduced into evidence by plaintiffs. Wells examined the exhibits offered by plaintiffs and testified, in his opinion, that defendant had never misrepresented or concealed any material facts relative to the fuel systems of Beech aircraft containing the 40-gallon fuel cell, specifically the single-engine Bonanza.

contend: (1) There was reversible error committed in the form of the instructions given to the jury concerning the plaintiffs' burden of proof; (2) there was reversible error committed in the form of the instructions given to the jury concerning plaintiffs' duty to discover the fraudulent concealment of defendant; and (3) there was reversible error committed when the court failed to allow the jury to consider evidence allegedly critical to the plaintiffs' case by excluding two items of documentary evidence, i.e., an article from the Wall Street Journal, exhibit No. 2, and a Government Accounting Office Report (GAO Report), exhibit No. 58.

Before proceeding to a discussion of the arguments both in support of and in opposition to the actual assignments of error, and in aid of an evaluation of the propriety of the jury instructions and evidentiary rulings, it is appropriate to note what plaintiffs had to establish as a matter of proof to be entitled to a verdict that the statute of limitations had been tolled. ■ In the earlier appeal of the pleading question, we noted, "[i]n order to establish fraudulent concealment, the complaint must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry. [Citation.] In urging lack of means of obtaining knowledge, it must be shown that in the exercise of reasonable diligence the facts could not have been discovered at an earlier date. [Citation.] 'The existence of such fraud must be alleged clearly and unequivocally, and must not rest upon inferences.' [Citations.]" (*Baker* v. *Beech Aircraft Corp., supra,* 39 Cal.App.3d 315, 321.) What we said there was said with reference to pleading, but the same principles equally apply here where the plaintiffs' task was to prove what they had alleged.

Amplifying the principles here noted, Witkin observes, "[t]he rule is that the plaintiff must *plead and prove the facts* showing: (a) Lack of knowledge. (b) Lack of means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date). (c) How and when he did actually discover the fraud or mistake. Under this rule constructive or presumed notice or knowledge are equivalent to knowledge. So, when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation (such as public records or corporation books), the statute

commences to run." (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 339, pp. 1180-1181, original italics.) ■ Additionally, it also is the rule that mere ignorance of the nature and extent of the operative facts causing a personal injury and giving rise to a cause of action, where such ignorance has not been induced by fraud, will not prevent the running of the statute of limitations to bar a personal injury action. (*Rubino* v. *Utah Canning Co.*, 123 Cal.App.2d 18, 28 [266 P.2d 163].)

. In this latter connection, a so-called rule of inquiry was clearly announced in *Mock* v. *Santa Monica Hospital*, 187 Cal.App.2d 57 [9 Cal.Rptr. 555]. In that medical malpractice action the court opined that "[c]ertainly, a prudent person would believe that if, in the course of an operation at one point on the body, a serious and painful injury occurred to another part of the body, there was cause for an investigation for the purpose of determining whether there was fault on the part of the surgeons and their assistants." (*Id.*, at p. 66.) In other words, when a plaintiff has notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation into how and why he was injured, the statute commences to run. (*Sanchez* v. *South Hoover Hospital*, 18 Cal.3d 93, 101 [132 Cal.Rptr. 657, 553 P.2d 1129].)

Parenthetically, by way of further factual background, in terms of plaintiffs' theory under which they contended that the statute had been tolled, there was evidence that this particular model aircraft was equipped with 40-gallon fuel tanks, located in the leading edge of each wing, which were designed in such a way as to make possible the phenomenon of *unporting*. This term describes a situation in which, at times of reduced fuel levels, certain maneuvers of the aircraft, because of centrifugal force, will cause the fuel to shift away from the outflow port of one or the other of the fuel tanks, depending on the direction of the maneuver, thus exposing the port to an intake of air instead of fuel. When this condition occurs, it has the effect of starving the engine of fuel, thus interrupting the continuous firing of the engine, and thereby imperiling the capacity of the aircraft to maintain enough power to stay airborne.

The evidence adduced at the trial consisted of the presentation of extended testimony and documentary evidence about what defendant had done (or not done) to alert the FAA and the buyers of its Bonanza aircraft to this *unporting* phenomenon, and it was upon the state of the record thus accumulated that plaintiffs sought a verdict that defendant had fraudulently misrepresented or concealed this data in such a way as

to toll the statute until plaintiffs read the Wall Street Journal article which discussed in detail the alleged dangerous design defect.[3]

However, as noted, the assignments of error do not go to any issue of substantial evidence. Plaintiffs only claim error with respect to the giving of a certain jury instruction and on account of the exclusion of two items of documentary evidence.

I

Turning to the first assignment of error, plaintiffs challenge the propriety of the instruction designated as Court 2.[4] The language focused on and complained of by plaintiffs is the inclusion of the words "from the plaintiffs" appearing in paragraph No. 1 of the cited instruction. ■ Plaintiffs argue, because of the inclusion of this language, that they were erroneously saddled with the burden of proving that the alleged misrepresentations and concealments were undertaken by defendant with

---

[3]One of the plaintiffs' primary allegations in the third amended complaint seeking to justify tolling of the statute of limitations was the claim that defendant withheld information from the National Transportation Safety Board (NTSB) which prevented it from determining what plaintiffs contend was the true probable cause of this accident, namely, unporting. It is abundantly clear from the evidence that both the NTSB (or its predecessor, the Civil Aeronautics Board), and the FAA, were both aware of the so-called unporting effect in Beech airplanes before the October 16, 1968, Las Cruces crash. Both the FAA and the NTSB performed their own tests in 1967. The FAA reevaluated the fuel system and reported to the NTSB in February of 1968 that there were "no areas of non-compliance." Wells testified that he first became aware of the unporting phenomenon in another manufacturer's airplane in 1965. Thus, the FAA and the NTSB were aware of the effect of fuel movement in the 40-gallon fuel cell with which the crashed Bonanza was equipped well before they published their report in 1969 on the Las Cruces accident.

We note that there was no evidence that defendant withheld information from government agencies or from anyone else investigating this accident. No one ever asserted that the Las Cruces accident was caused by unporting except for plaintiffs' California attorneys. The Wall Street Journal article does not mention the crash, and none of the correspondence sent to defendant by the FAA ever claimed that the Las Cruces accident was caused by unporting.

[4]Instruction Court 2 in pertinent part reads as follows:

"In this action in which the plaintiffs seek to estop the defendant, BEECH AIRCRAFT CORPORATION, from raising the statute of limitations defense, the plaintiffs have the burden of establishing by the preponderance of the evidence all of the facts necessary to prove the following issues:

"1. That Beech fraudulently concealed material facts *from the plaintiffs* relating to the forty gallon fuel cell as utilized in the Beech Bonanza Aircraft which would have disclosed the nature and extent of plaintiffs' right of action, by active misrepresentations or by purported disclosures which actually suppressed material facts.

"2. That the plaintiffs were not at fault for failing to discover those facts prior to May 24, 1971 . . ." (Italics added for ease of reference.)

actual awareness of these plaintiffs and with the specific intent to deceive them.

However, the instruction challenged was only an introductory instruction in a group of 11 special jury instructions on the statute of limitations issue.

The nature and extent of plaintiffs' burden of proof for justifying their late filing is set forth, not in a single general instruction, but rather in the entire group of special instructions. The challenged instruction is based on BAJI No. 2.60, a skeleton instruction, and was a modified version of one submitted by plaintiffs. It was intended to apprise the jury of the general issues to be decided, and in paragraph No. 1 it served to orient the jury on the issue of fraudulent concealment of a cause of action based upon the allegedly defective design of the 40-gallon fuel tanks in the downed aircraft. It directed the jury's attention to the general issues plaintiffs had to prove before instructing them on more specific matters inolving such proof.

It is true that the objected to language, standing alone, could be characterized as ambiguous with reference to what idea the inclusion of those words imported. However, as a matter of semantics, a concealment from a class of individuals is also a concealment from each individual of the class, and so the instruction is susceptible of either meaning. As such the instruction could have better omitted the language complained of by plaintiff, but when considered in light of the nine instructions following it, ones which discussed the elements of fraudulent concealment and misrepresentation together with plaintiffs' duty of inquiry, it did not operate to mislead the jury and thus did not constitute error.

We say this, for if there were any uncertainty in the minds of the jury induced by the Court 2 instruction, it was immediately dispelled by the succeeding instructions. Jury instruction No. 18, immediately following the Court 2 instruction stated: "The conduct of the defendant need not be shown to have been directed specifically against the plaintiffs for the bringing of an action by these plaintiffs, but only that it was aimed against the acquisition of the requisite knowledge which would naturally lead to such a result."

A subsequent instruction on the elements of fraudulent concealment stated in part: "2. The Defendant must have concealed or suppressed the fact with the intent to prevent *persons* from learning the material fact."

(Court 5, italics added.) An instruction on the elements of fraudulent misrepresentation stated in part: "4. The Defendant must have made the representation with an intent to induce reliance on the representation[.]" (Court 6.)

The above jury instructions, or portions thereof, which followed the Court 2 instruction apprised the jury of the actionable mode of transmission or suppression of material facts. None of these specific instructions required the jury to find, as plaintiffs argue, that defendant fraudulently concealed material facts specifically from the plaintiffs or that plaintiffs had the burden to prove that each fraudulently concealed material fact was specifically kept from them individually. Plaintiffs' interpretation of the court's introductory instruction in the context of the other 10 is strained and without logical foundation in terms of the normal and natural meaning of language.[5]

"It is a fundamental rule that all the instructions must be read together and construed as a whole. If, so construed, they state the law fairly, the charge is proper." (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 244, p. 3057.) After construing the Court 2 instruction and the instructions which followed it, it is our view that they fairly stated plaintiffs' burden of proof.

Accordingly, we hold that plaintiffs' first assignment of error is without merit.

## II

Plaintiffs next contend that the trial court erred when it gave three jury instructions on the issue of their duty of inquiry. The first such instruction given by the court was as follows: "If you find that a reasonable person in

[5]It is especially difficult to find support for plaintiffs' contention here in view of the way defendant's counsel defined the burden of proof in his closing argument to the jury. Near the end of his extended remarks, Mr. Packard, counsel for defendant stated, "They're [plaintiffs] claiming that we [Beech] committed fraud for the purpose of preventing people from ascertaining facts about the 40 gallon fuel cell. That's what they're claiming. They have the burden of proving that."

Nothing could be more clear than that Mr. Packard, in defining the burden of proof on this issue, in no sense could have been characterized as extending that burden of proof to include the requirement of offering evidence that there was a deliberate attempt to conceal facts from these particular plaintiffs. In the quoted language he used the words "of preventing people from ascertaining facts . . ." Then he said that "they have the burden of proving that." That was a fair statement of the thrust of the instructions taken as a whole.

a like situation to the plaintiffs should have discovered the material facts relating to the forty gallon fuel cell as utilized in the Beech Bonanza Aircraft which gave rise to their cause of action, prior to May 24, 1971, then Beech is not estopped and plaintiffs' claim is barred by the one year Statute of Limitations." (Court 4.) The remaining two instructions questioned read as follows: "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry is chargeable with the knowledge that a reasonably prudent man would find out by following up that inquiry." (Court 7.) "Under the circumstances where a prudent man would not be put on inquiry, the mere fact that means of knowledge are open and not availed of, does not operate to charge that person with notice of available facts." (Court 8.)

With reference to this assignment of error plaintiffs seem to take the position that they were absolved of any duty to inquire into the cause of the crash. ■ This contention has no basis in law; a person who claims that the statute of limitations is suspended because of someone's fraudulent concealment has an independent duty to pursue an inquiry into the cause of the injury with reasonable diligence. (*Mock* v. *Santa Monica Hospital, supra,* 187 Cal.App.2d 57, 66.) This is not a case where the "blameless ignorance" rule applies, such as in *Warrington* v. *Charles Pfizer & Co.,* 274 Cal.App.2d 564, 569-570 [80 Cal.Rptr. 130], and in *G.D. Searle & Co.* v. *Superior Court,* 49 Cal.App.3d 22, 25-26 [122 Cal.Rptr. 218]. These plaintiffs knew that their injuries and damages were caused by an airplane crash, and they had the burden of proving that "in the exercise of reasonable diligence the facts could not have been discovered at an earlier date. [Citation.]" (*Baker* v. *Beech Aircraft Corp., supra,* 39 Cal.App.3d 315, 321.)

The defect of plaintiffs' argument lies in their selective use of excerpts from the earlier *Baker* opinion, without reference to a discussion of the law applicable to a plaintiff's duty in these circumstances. Moreover, they fail to discuss how or in what manner the court's instructions on plaintiffs' duty to discover were erroneous. Because a jury instruction was not a verbatim quote from a portion of the earlier *Baker* opinion does not render it prejudicial or erroneous. In fact, the instructions given by the court here on plaintiffs' duty to discover expressed a somewhat more lenient standard from that actually required by California law.

The test is whether plaintiffs had actual or presumptive knowledge of facts sufficient to put them on inquiry. In the earlier *Baker* opinion we stated, in alleging lack of means of obtaining knowledge, that "[i]t must

be shown that in the exercise of reasonable diligence the facts could not have been discovered at an earlier date. (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 339, pp. 1180-1181.)" (*Id.,* at p. 321.)

That portion of Witkin cited in the earlier *Baker* opinion states that a plaintiff must not only prove lack of knowledge, but also "[l]ack of means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date)." (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 339, p. 1181.) As noted earlier in this opinion, the principle that a plaintiff must proceed with reasonable diligence was reaffirmed in *Sanchez* v. *South Hoover Hospital, supra,* 18 Cal.3d 93, a medical malpractice case where the plaintiff-patient alleged that the doctor failed to disclose certain information to her. In affirming an order granting defendant's summary judgment, the Supreme Court reiterated that a plaintiff must pursue an inquiry into the cause of injury with reasonable diligence, and held that the mere fact of nondisclosure by the physician would not suspend the statutory period. (*Id.,* at p. 98.)

That court also commented on the degree of knowledge possessed by a plaintiff sufficient to commence the running of the statute of limitations: "Plaintiff's deposition reveals that, when released [from the hospital], she believed she had been a victim of malpractice. Referring to her state of mind at the time of discharge she said 'Yes, I did think they had done something wrong because of all the time that I stayed there suffering.' It is fair to conclude that by March 30, 1972, plaintiff had become alerted to the necessity for investigation and pursuit of her remedies." (*Id.,* at p. 102.)

So, also, the testimony of the individual plaintiffs herein demonstrated that they knew something was wrong which required further investigation, a state of mind that existed long before they read the Wall Street Journal article. The fact that contents of the NTSB report were communicated to plaintiffs in 1969 and that such report showed that the Las Cruces crash was caused by power plant failure constituted a degree of knowledge far greater than that possessed by Mrs. Sanchez and which the California Supreme Court held sufficient for the statute's beginning to run in that case.

The instructions given by the trial court on plaintiffs' duty of inquiry reflect a standard somewhat less stringent than the requirement that they proceed with reasonable diligence, and as a consequence there was no error committed in giving them.

## III

Plaintiffs finally claim that it was prejudicial error to exclude from evidence the Wall Street Journal article as well as the GAO Report. The exclusion of these documents was an exercise of sound discretion of the trial court which should not be disturbed on appeal in the absence of a showing of an abuse of discretion.

The Wall Street Journal article and the GAO Report were only two of a vast array of documents offered by plaintiffs. The trial court admitted numerous test reports, correspondence by defendant and the FAA, customer complaints, and reports of accidents and incidents, not only for a single engine Bonanza but also for the twin engine Baron. This voluminous documentation included writings covering the period of time from 1961 to 1972. In effect, the court admitted into evidence every document offered by plaintiffs which was authored or received by defendant, by the FAA, or by the NTSB pertaining in any way to any Beech airplane using a fuel system which contained the 40-gallon fuel tank in question. The Wall Street Journal article and the GAO Report contained little, if any, information not contained in other documents already admitted, this except for certain highly prejudicial items contained in the former.

### A.

The Wall Street Journal article published in July of 1971 was clearly hearsay, in terms of any concealment issue, but plaintiffs took the position at trial that the article was offered not for the truth of the matters therein contained but to show plaintiffs' state of mind. In this connection, in the language of plaintiffs' brief, this article was the "cornerstone" of the plaintiffs' response to the defense of the statute of limitations raised by defendant. They argue further in their brief "that this article gave them detailed information on the nature and extent of the defects in the Bonanza aircraft and [defendant's] attempts to conceal the defect."

That plaintiffs were impressed by the contents of the article is self-evident; they filed their action within 30 days of reading it. However, despite a repeated and careful reading of plaintiffs' brief, we must confess that we cannot find how or why they define the exclusion of the article as prejudicial.

·Earlier in this opinion, in tabulating what elements of proof the plaintiffs would have to show, we observed from the earlier *Baker* opinion that it was necessary, among other things, to establish "when the fraud was discovered." Clearly, their reading of the Wall Street Journal article represented the plaintiffs' claimed discovery of the alleged fraud, and so the *date* on which that occurred was relevant. In this connection the plaintiff Pribble was asked and he answered as follows:

"Q. . . . Did there come a point in time when for the first time you had further information which you thought was relevant to this accident?

"A. Yes, sir.

"Q. When did that occur, sir?

"A. That would be approximately, I guess, November or December of 1971. . . .

"Q. Did someone tell you something at that time that caused you to in turn read something?

"A. Prior to that time that I was just speaking, I received a call from Mrs. Hampson, and she advised me that I ought to read a copy of an article that appeared in the July the 30th, 1971 Wall Street Journal, and she said that she would see that a copy was sent up to me.

"Q. All right. Did she tell you anything further at that time that you recall?

"A. No, sir.

"Q. All right, sir. Were you ultimately able to obtain a copy of that Wall Street Journal article?

"A. Yes, sir.

"Q. And did you read it?

"A. Yes, sir.

"Q. And that was the time you say here was at a later time?

"A. It was approximately in late November or December, 1971. . . .

"Q. Mr. Pribble, to get you back into the context we were discussing, when you read this Wall Street Journal article, sir, that was published on July 30th, 1971 and you read it in late 1971, what is it you learned from that article, sir, in substance, which caused you now to be further curious about the accident? . . .

"THE WITNESS: I read that article, and the article discussed in some length litigation that had been brought against Beech Aircraft Corporation [sic] for alleged defects in the fuel system in certain models of their airplanes, one of which was one that I was riding in, and that these alleged defects in the fuel system caused fuel starvation, engine interruption and at low altitudes, fatal crashes. I at that point—

"MR. McCARTHY: Wait a minute, sir. We'll get to what you next did.

BY MR. McCARTHY: "Q. Is that what you were going to say?

"A. I was going to say that was the first indication that I first—first explanation I had as to what might have been wrong with the airplane that I was in. . .

"Q. Have you told us the substance of what it is you learned the first time when you read that article?

"A. Yes, sir.

"Q. You mentioned that the article described certain models of Beech aircraft, one of which was the one you had been riding in, a Bonanza?

"A. Yes, sir.

"Q. Did the article make any specific mention of your—the accident that you had been involved in?

"A. No, sir.

"Q. What was it then that you felt the article revealed which now you wanted to pursue? . . .

"THE WITNESS: Well, I thought at that point that I had to get further information regarding the aircraft, the plane I was in.

BY MR. McCARTHY: "Q. And what did you next do in that regard?

"A. Well, I then discussed this article with Mr. Pongetti and in discussing this, we both agreed that I ought to write to, I believe it is the NTSB to get a copy of the accident report.

"Q. And did one of you do that?

"A. Yes, sir.

"Q. And did you receive that report?

"A. Yes, sir.

"Q. When did you receive that, sir?

"A. I believe that it was in February of 1972.

"Q. Now, did you review the report when you received it?

"A. Yes, sir.

"Q. And what did you learn then from reviewing that report?

"A. Well, one item of significance I found in that report was that the probable cause of the crash, as listed by the NTSB, was engine malfunction of an undetermined cause, or words to that effect . . .

"Q. Did you learn anything from the NTSB article, sir, that you hadn't already learned from the Wall Street Journal?

"A. No, sir."

From the foregoing, it is clear that the plaintiffs had the full benefit of testimony concerning how they came to discover what soon thereafter they alleged as fraudulent concealment by defendant with reference to what they perceived to be the cause of the crash. Nevertheless, they argue that it was error to exclude from evidence the Wall Street Journal article itself, urging that the article, notwithstanding the testimony quoted, was critical to support their claim of a lack of knowledge of a possible cause of the crash. ■ This contention is specious, because their lack of such knowledge was never an issue at the trial. It was at all times conceded by defendant that plaintiffs were ignorant of the cause of the crash, and it is well settled that mere ignorance of the facts will not in and of itself toll the statute of limitations. (*Rubino* v. *Utah Canning Co., supra,* 123 Cal.App.2d 18, 28.)

The main purpose of the trial was to measure the conduct of both sides in terms of what they did or did not do before May 24, 1971, either to conceal or to inquire, and so the relevance of the Wall Street Journal article was marginal at best and would have only been cumulative of Mr. Pribble's testimony on the issue of how and when the alleged fraudulent concealment was discovered. Moreover, the plaintiffs could not have been prejudiced by exclusion of the article because almost all of the documents and events discussed in the article were otherwise admitted into evidence. Reference to the article reveals that it discussed the existence of several Beech accidents, the 1971 Service Letter, the 1966 tests by Beech employees, and the various communications and documents authored by the FAA and the NTSB, all of which were admitted into evidence.

■ Regardless of the foregoing, the trial court expressly based its exclusion of exhibit No. 2 (the Wall Street Journal article) on Evidence Code section 352. Portions of the article contained information of a highly prejudicial nature, and in at least one instance of erroneous information. The second column of the article stated that Beech settled an accident in Tacoma, Washington, for $297,500. In fact, the great majority of this settlement sum was paid by a codefendant. The article also contained quotations attributed to one of plaintiffs' attorneys, Daniel Cathcart, and to an expert retained by him, Davis Holladay. It should also be noted that nothing in the article discussed the Las Cruces, New Mexico, crash, and nothing in the article stated or inferred that defendant had engaged in conduct that would prevent these or any other potential plaintiffs from discovering facts that would apprise them of their cause of action. On the other hand, because of the unsubstantiated innuendoes in the article and because of the reference to other litigated cases and the verdicts in those cases, it is our view that the Wall Street Journal article was properly excluded by the trial court under section 352 of the Evidence Code.

### B.

Exhibit No. 58, designated otherwise as the GAO Report, was irrelevant to any issue at the trial. No foundation was laid by plaintiffs for its introduction and actually it was determined outside the jury's presence that the quoted material pertained to subject matter unrelated to unporting or to the Baron or Bonanza airplanes.

The GAO Report was first referred to by plaintiffs' trial counsel during cross-examination of defendant's employee Rembleske. This was contrary to the provisions of Evidence Code section 453, which require that an adverse party be given sufficient notice of a request made under Evidence Code section 452 in order that the adverse party can prepare to meet the request. Over defendant's strenuous objection to this line of questioning, the trial court permitted plaintiffs' trial counsel to continue his cross-examination of Rembleske. Defendant's request to have the GAO Report taken under consideration outside the presence of the jury was denied. Defendant subsequently was given an opportunity to present evidence outside the presence of the jury to demonstrate that certain excerpts from the GAO Report were irrelevant to the 40-gallon fuel system on Beech airplanes. Plaintiffs introduced no evidence to the contrary. The trial judge thereafter denied plaintiffs' request to discuss the GAO Report before the jury, and read the following to the jury: "During the cross

examination of Mr. Rembleske by Mr. McCarthy, on the afternoon of December 5th, 1977, there was testimony about a Government Accounting Office report, also known as a GAO report, and about some congressional hearings. This testimony has been stricken by the Court. It is no longer in evidence in this case. [¶] You are, therefore, instructed to disregard this testimony, consider it as though you had never heard of it."

■ Plaintiffs' discussion of why the court committed error in excluding the GAO Report consumes little more than one page in their opening brief, and there is no discussion of why this constituted reversible error. Plaintiffs, as already noted, laid no foundation at trial for the admission of exhibit No. 58 other than it was a report by a governmental agency. The GAO Report is a hearsay document, and no evidence at the trial was presented as to the identity and qualifications of the individuals who prepared said report, the facts upon which they based the report, or the circumstances under which it was prepared. Exhibit No. 58 was not prepared by the FAA or NTSB, which are charged with certifying and regulating airplanes and investigating airplane accidents, but rather by a separate and independent branch of the government, the general accounting office. Evidence Code section 452 sets forth matters which may be judicially noticed, provided the requirements of Evidence Code section 453 have been satisfied. At the trial, plaintiffs did not provide the court with sufficient information to permit it to take judicial notice of the GAO Report.

In sum, the jury instructions fairly stated plaintiffs' burden of proof with reference to the two principal issues which comprised their task of demonstrating some justification for the delay in filing their action. Otherwise, the Wall Street Journal article and the GAO Report, for the reasons stated, were properly excluded.

DISPOSITION

The judgment is affirmed.

Kaufman, Acting, P. J., and Morris, J., concurred.