[No. B061400. Second Dist., Div. One. June 7, 1994.]

SYBIL NIDEN GOLDRICH, Plaintiff and Appellant, v.
NATURAL Y SURGICAL SPECIALTIES, INC., et al., Defendants and
Respondents;
DOW CORNING CORPORATION, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

**COUNSEL**

Denise M. Dunleavy and Daniel U. Smith for Plaintiff and Appellant.

Gordon & Rees, Jack B. McCowan, Jr., Daniel J. Herling, Diane R. Crowley, Dinsmore & Shohl, Frank C. Woodside III, Nancy A. Lawson and Andrew Osterbrock for Defendant and Appellant.

Lynch, Loofbourrow, Gilardi & Grummer, Robert S. Niemann, Lauren M. Terk, Sally J. Bertuccelli, Sedgwick, Detert, Moran & Arnold, Frederick D. Baker, Michael F. Healy, Ann L. Wilson, Schaffer & Lax, Barbara S. Fasiska and Michael M. Walsh for Defendants and Respondents.

## OPINION

**VOGEL (Miriam A.), J.**—The primary issue in this case is whether Sybil Niden Goldrich's claims against several breast implant manufacturers are barred by limitations. Based upon undisputed evidence establishing that Mrs. Goldrich experienced excruciating pain, scarring, disfigurement and disability in July 1983, and was advised by three physicians in 1984 to have the implants permanently removed, we conclude her 1986 lawsuit was untimely.

### FACTS

In early 1983, Mrs. Goldrich underwent bilateral modified radical mastectomies, after which she consulted four plastic surgeons about reconstructive surgery and ultimately engaged Kurt Wagner, M.D. On July 26, 1983, Dr. Wagner performed reconstructive surgery for Mrs. Goldrich and implanted two silicone gel filled, polyurethane foam covered mammary prostheses.[1] When she awoke after the surgery, Mrs. Goldrich felt something had gone "terribly wrong," a feeling which persisted throughout her hospital stay. She had a fever, a rash on her torso, shooting, stabbing pains across her chest, and a "terrible tightness" in the area of the implants. Over the next month or two, Mrs. Goldrich's breasts hardened and became dark red. When she complained to Dr. Wagner, he told her he would remove the original implants and replace them with a different type, which he hoped would reduce the potential complications. On November 4, as part of the breast augmentation procedure, Dr. Wagner performed two nipple grafts and, during this second surgery, replaced both implants.[2]

Mrs. Goldrich continued to suffer stabbing and burning pains in her chest. On December 31, while her husband was changing her bandages (Mrs. Goldrich is married to a gynecologist, James Goldrich, M.D.), he noticed that her right implant was "extruding" through her nipple graft. (She later described this as "the terror of actually watching the implant force its way out of the body through a . . . sloughed nipple graft," and she suggested the associated pain ought to "be reserved for dedicated masochists, and X-rated on the basis of violence.") When she saw the look on her husband's face, Mrs. Goldrich was understandably alarmed and her first question to him was, "My God, Jim, am I going to die?" Mrs. Goldrich knew Dr. Wagner was out of town for a few days and therefore called the physician who was handling his calls. She went to see that doctor the next day, at which time he recommended immediate removal of the implant.

---

[1] Dow Corning Corporation supplied the silicone material used in both implants, one of which was manufactured by Cox-Uphoff International, the other by Aesthetech Corporation. Both implants were distributed by Natural Y Surgical Specialties, Inc.

[2] This set of implants (and all subsequent implants) were made by Cox-Uphoff.

On January 4, 1984, Dr. Wagner removed Mrs. Goldrich's right implant. After this third operation, Mrs. Goldrich's left breast remained hard and it began to "migrate" in a downward direction. Dr. Wagner said he would fix the left implant when he replaced the right implant and, on March 12, Mrs. Goldrich underwent a fourth operation for these procedures. The problems were not corrected and, shortly after the fourth surgery, the implants began migrating in different directions, the right implant upward and the left implant downward. She continued to suffer intermittent burning pain. On May 2, Mrs. Goldrich's left implant was replaced. Shortly after this fifth surgery, Mrs. Goldrich became "disheartened and frustrated" because of her problems with the implants and she discontinued Dr. Wagner's services.

During the summer of 1984, Mrs. Goldrich sought opinions from several other doctors. She went to Cleveland, Ohio, where she consulted Baumann Ghuyeron, M.D., who recommended the removal of both implants. She went to Atlanta, Georgia, where she consulted Carl Hartrampf, M.D., who also recommended the removal of both implants, ruled out the possibility of new implants and recommended that Mrs. Goldrich either go bare or undergo a "transverse abdominal island flap" (TAIF) reconstruction procedure in which her own tissue would be used for breast reconstruction. She also went to San Francisco, where she consulted Louis Vascones, M.D., who agreed with Dr. Hartrampf's recommendations. During all this time, Mrs. Goldrich continued to experience the same stabbing and burning pains.

On December 18, 1984, during her sixth breast reconstruction surgery, Dr. Hartrampf permanently removed Mrs. Goldrich's implants, at which time he noticed (and recorded in his postoperative report) that the right implant was "partially disrupted preoperatively" (that is, it was broken). Dr. Hartrampf then performed extensive breast reconstruction surgery using Mrs. Goldrich's own tissue.[3] On February 15, 1985, Dr. Hartrampf sent a copy of his postoperative report to Mrs. Goldrich's husband at the Goldrich home.

On July 11, 1986, Mrs. Goldrich sued Cox-Uphoff.[4] Following demurrers to the original and first amended complaints, a second amended complaint,

---

[3] Dr. Hartrampf performed the TAIF reconstruction he had previously recommended as an alternative to going bare, an extraordinarily invasive nine-hour procedure—which involved the harvesting and movement of two parallel flaps of muscle from the abdomen to the chest to create breast mounds, the use of a Prolene mesh strip which was "stapled into position" to close the resulting abdominal gap, blood transfusions and subsequent follow-up surgical procedures.

[4] Dr. Goldrich was named as a plaintiff in the original complaint, in a cause of action for loss of consortium. He was voluntarily dropped from the subsequent pleadings and he is not a party to these appeals.

filed in March 1989, named Natural Y Surgical Specialties, Inc., Cox-Uphoff International, Aesthetech Corporation, Dow Corning Corporation, Scotfoam Company and Dr. Wagner as defendants, and alleged numerous causes of action on theories of strict products liability, negligence, breach of express and implied warranties, fraud, and negligent misrepresentation.[5] The fraud cause of action was thereafter successfully attacked by Cox-Uphoff (by demurrer) and by Dow Corning, Natural Y and Aesthetech (by motions for judgment on the pleadings), and trial of the remaining claims was set for the fall of 1991.

On July 25, 1991, the trial court granted Cox-Uphoff's motion for summary judgment on the ground that Mrs. Goldrich's claims were barred by limitations. There followed a series of motions by Natural Y, Aesthetech and Dow Corning, all asserting the bar of collateral estoppel (by reason of the judgment in favor of Cox-Uphoff), all of which were granted. Postjudgment motions for costs by Natural Y, Aesthetech, Cox-Uphoff and Dow Corning were granted and cost judgments were entered. On March 24, 1992, Mrs. Goldrich moved for a new trial against Dow Corning, claiming she had "newly discovered" evidence in the form of internal Dow Corning documents indicating that Dow Corning had lied about the dangers of silicone implants. On May 4, the trial court granted the motion for a new trial.

Mrs. Goldrich appeals from the judgments and the cost awards in favor of Cox-Uphoff, Natural Y, Aesthetech and Dow Corning.[6] Dow Corning appeals from the order granting Mrs. Goldrich's motion for a new trial.

DISCUSSION

I.

Mrs. Goldrich contends her personal injury claims[7] were not barred by the one-year statute of limitations and that, therefore, the summary judgments should not have been granted. We disagree.

A.

Personal injury actions, whether based on simple negligence or on a theory of products liability, must be commenced within one year of the date

---

[5]Scotfoam and Dr. Wagner are not parties to this appeal.

[6]Mrs. Goldrich filed five or more notices of appeal. Some are premature, others are taken from nonappealable orders. Since she has also appealed from the judgments, there is no need to untangle the web created by the superfluous notices of appeal and we make no attempt to do so.

[7]We address the fraud cause of action separately, *post*.

the plaintiff's action accrued. (Code Civ. Proc., § 340, subd. (3);[8] *Sevilla* v. *Stearns-Roger, Inc.* (1980) 101 Cal.App.3d 608, 610 [161 Cal.Rptr. 700].) The action accrues on the date of injury—unless application of the discovery rule delays the time of accrual. (*Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109 [245 Cal.Rptr. 658, 751 P.2d 923].) "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . [T]he limitations period begins once the plaintiff ' " 'has notice or information of circumstances to put a reasonable person *on inquiry* . . . .' " ' . . . A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Id.* at pp. 1110-1111, fn. and citations omitted, italics in original.)

This discovery rule takes into account the policy of deciding cases on the merits as well as the policies underlying the statute of limitations (to prevent stale claims and to require diligent prosecution). "Because a plaintiff is under a duty to reasonably investigate and because a *suspicion* of wrongdoing, coupled with a knowledge of the harm and its cause, will commence the limitations period, suits are not likely to be unreasonably delayed, and those failing to act with reasonable dispatch will be barred. At the same time, plaintiffs who file suit as soon as they have reason to believe that they are entitled to recourse will not be precluded." (*Jolly* v. *Eli Lilly & Co.*, *supra*, 44 Cal.3d at p. 1112.)

## B.

Where, as here, the undisputed facts are susceptible of only one legitimate inference—that by December 1984 at the latest, Mrs. Goldrich had a suspicion of wrongdoing, coupled with knowledge of the harm and its cause—her complaint, filed in July 1986, was time-barred and summary judgment was properly granted. (*Jolly* v. *Eli Lilly & Co.*, *supra*, 44 Cal.3d at p. 1112.)

Mrs. Goldrich's symptoms began immediately after the first implant surgery in July 1983. One surgery after another failed to correct the problem and her condition got worse, not better. Her excruciating pain continued, the implants migrated and one "extruded" through a nipple graft. By the summer

---

[8]All section references are to the Code of Civil Procedure.

of 1984, three specialists had recommended permanent removal of the implants. On December 18, 1984, Mrs. Goldrich's implants were finally removed for the last time. Viewed from the perspective of a reasonable person, Mrs. Goldrich must have suspected or certainly should have suspected that she had been harmed, and she must have suspected or certainly should have suspected that her harm was caused by the implants. On these facts, we reject as impossible the suggestion that, by December 1984, she did not have a very strong suspicion of wrongdoing. (See *Marks* v. *Minnesota Mining & Manufacturing Co.* (1986) 187 Cal.App.3d 1429, 1433, fn. 5 [232 Cal.Rptr. 594] [suggesting that, in a breast implant case, the statute begins to run upon the first of several implant removal surgeries.)

### C.

To avoid these conclusions, Mrs. Goldrich contends she thought her problems were due to her body's rejection of the implants, not to the implants themselves. She had been warned about the possibility of a "foreign body reaction" but not about the possibility of a defective implant product (she was told they would "last a lifetime") and, she claims, she therefore did not think about whether the implants were responsible for her ordeal. According to Mrs. Goldrich, it wasn't until she talked with other implant patients in late 1985 (and then with several lawyers) that she first suspected the implants were to blame.

A reasonable woman would have been suspicious about the implants. During the summer of 1984, Mrs. Goldrich had traveled around the country to consult with three breast implant specialists, all of whom unequivocally recommended permanent removal of the implants, a recommendation which by itself is sufficient to make a reasonable person suspicious. (*Rose* v. *Fife* (1989) 207 Cal.App.3d 760, 770 [255 Cal.Rptr. 440]; *Dolan* v. *Borelli* (1993) 13 Cal.App.4th 816, 823 [16 Cal.Rptr.2d 714].) Mrs. Goldrich's stated belief that her problems were caused by the limitations of her own body and its rejection of a foreign substance is belied by her decision to undergo the physically demanding (and then still experimental) TAIF procedure, which itself required the use of a different foreign substance (the Prolene mesh) to close the gap in her abdomen (not to mention the risks attendant to the blood transfusions necessitated by the TAIF procedure). Had she seriously believed her body was unable to accept further intrusion, she could and would have gone bare. For these reasons, it is immaterial that Dr. Hartrampf may not have expressly mentioned the possibility of a defect in the implants. In short, there is no merit to Mrs. Goldrich's position. (*Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1150 [281 Cal.Rptr.

827] [subjective suspicion is not required; if the facts would make a reasonable person suspicious, the plaintiff has a duty to investigate and is charged with knowledge of matters which would have been revealed by such an investigation]; *Rose* v. *Fife, supra,* 207 Cal.App.3d at pp. 770-772 [the plaintiff's own physical symptoms triggers the statute of limitations]; *Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1113 [the discovery of facts, not their legal significance, triggers the statute].)

## D.

We summarily reject Mrs. Goldrich's contention that the trial court improperly considered whether she "knew or should have reasonably known the [implants were the] cause of her disability" and that it should, instead, have determined the date on which she acquired a "suspicion of wrongdoing." Whatever semantical difference there may be, it is immaterial—on appeal from a summary judgment, we look only to the validity of the judgment, not the reasons it was granted in the first instance. (*Barnett* v. *Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 682 [187 Cal.Rptr. 219]; *Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674].) Accordingly, our conclusion that, by December 1984, Mrs. Goldrich suspected or reasonably should have suspected that her injury was caused by a problem with the implants (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1114) means the summary judgment was properly granted on the ground that Mrs. Goldrich's claims, first asserted in July 1986, were barred by the statute of limitations.

## E.

We also reject Mrs. Goldrich's suggestion that Dr. Wagner's repeated assurances somehow tolled the statute of limitations as to the manufacturers and suppliers of the implants. Mrs. Goldrich left Dr. Wagner's care in the spring of 1984 and, thereafter, consulted the other specialists. Whatever effect Dr. Wagner's comments may have had during the time he cared for her, they are irrelevant in light of subsequent occurrences.[9]

---

[9]For similar reasons, we have disregarded Mrs. Goldrich's description of her subsequent surgeries and her condition following the date on which her original complaint was filed. This is not a case where the effects of the implants occurred without perceptible trauma and Mrs. Goldrich's postfiling condition has nothing to do with the statute of limitations issue. (*Miller* v. *Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, 1622 [2 Cal.Rptr.2d 796]; *Davies* v. *Krasna* (1975) 14 Cal.3d 502, 514 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]; *Pereira* v. *Dow Chemical Co.* (1982) 129 Cal.App.3d 865, 873-874 [181 Cal.Rptr. 364].)

### F.

We also reject Mrs. Goldrich's suggestion that the summary judgment must be reversed because the order granting summary judgment failed to refer to the evidence as required by section 437c, subdivision (g). First, the trial court's statement that it was relying on all of the evidence makes it clear that it concluded, as do we, that the statute of limitations problem must be resolved against Mrs. Goldrich as a matter of law. Second, even assuming that, ideally, a further statement ought to have been given, there is no harm where, as here, our independent review establishes the validity of the judgment. (*Ruoff* v. *Harbor Creek Community Assn.* (1992) 10 Cal.App.4th 1624, 1627 [13 Cal.Rptr.2d 755].)

### II.

Mrs. Goldrich contends the trial court should not have disposed of her fraud cause of action by demurrer or motions for judgment on the pleadings. We disagree.

In the fraud cause of action of her second amended complaint, Mrs. Goldrich alleged that the defendants "falsely and fraudulently represented" to her, her physicians "and other members of the general public" that their product was "safe for use in breast surgery, that it posed no dangerous risks of injury to [Mrs. Goldrich], and that it would not require frequent removal from [her] body. [Mrs. Goldrich] is unable to provide further specificity with respect to representations made to [her] physician [but] defendants . . . possess full information and knowledge concerning the content of all such representations made to [her] physician. The representations by [the] defendants were, in fact, false. The true facts were that the . . . product was not safe for said purpose and was, in fact, dangerous to [Mrs. Goldrich's] health and body . . . and required frequent removal." In equally conclusory terms, the pleading alleges that, at the time the representations were made, the defendants knew they were false and nevertheless made them in order to "defraud and deceive" Mrs. Goldrich and with the intent to induce her to use the product in breast surgery.

This is not the stuff of which a fraud claim is made. Fraud must be pleaded with specificity, to provide the defendants with the fullest possible details of the charge so they are able to prepare a defense to this serious attack. To withstand a demurrer, the *facts* constituting every element of the fraud must be alleged with particularity, and the claim cannot be salvaged by references to the general policy favoring the liberal construction of pleadings. (*Committee on Children's Television, Inc.* v. *General Foods Corp.*

(1983) 35 Cal.3d 197, 216 [197 Cal.Rptr. 783, 673 P.2d 660].) Even in a case involving numerous oft-repeated misrepresentations, the plaintiff must, at a minimum, set out a representative selection of the alleged misrepresentations sufficient to permit the trial court to ascertain whether the statements were material and otherwise actionable. (*Id.* at p. 218.)

The pleading before us—which represents Mrs. Goldrich's third effort to plead her claims—did not come close to the required specificity. To the contrary, her conclusory allegations offer no facts at all and it is impossible to determine what was said or by whom or in what manner. We don't know whether the statements were made in writing (in package inserts or advertisements or otherwise) or orally (by executives or sales representatives or others) or by one or all of the defendants. Reliance is alleged in equally insufficient terms, with no explanation about how Mrs. Goldrich could have relied upon something she cannot now describe in any fashion.

Instead, Mrs. Goldrich simply contends the defendants' knowledge about their own communications somehow relieves her of her obligation to provide any factual averments at all. We disagree, and we find nothing in *Committee on Children's Television, Inc.* v. *General Foods Corp.*, *supra*, 35 Cal.3d 197, or in any other case to support this sort of pleading. Mrs. Goldrich has done nothing more than recast her negligence and products liability claims—that the implants were negligently and defectively made and distributed—in the traditional words of fraud, without any supporting facts. That simply is not enough. (*San Filippo* v. *Griffiths* (1975) 51 Cal.App.3d 640, 644-645 [124 Cal.Rptr. 399] [it is the nature of the right sued upon and not the form of action nor the relief demanded which determines the applicability of the statute of limitations].)

Moreover, there were no facts before the trial court to suggest that leave to amend would have done any good. This case had been pending a substantial period of time when the demurrer to the fraud cause of action was sustained without leave to amend, and Mrs. Goldrich had ample time to conduct discovery. She nevertheless failed to present any facts supporting a claim of fraud and she did not explain what it was she thought she could allege if she had yet another opportunity to pursue this claim. Accordingly, the fraud cause of action was properly disposed of at the pleading stage. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58] [it is the plaintiff's burden to prove a reasonable possibility that a pleading defect could be cured by a further amendment].)

Before we leave this issue, there are two more points to be made. Mrs. Goldrich suggests that, had the fraud cause of action survived the pleading

stage, she could have defeated the summary judgment motions attacking her other causes of action by asserting that "her delayed discovery was attributable to the defendants' fraudulent concealment of their wrongdoing." First, this contention is pregnant with the admission that Mrs. Goldrich remains unable to plead or prove a fraudulent misrepresentation and that what she is really talking about is concealment, which is not what she alleged. Second, this contention ignores the fact that there was no "delayed discovery." A defendant's fraudulent concealment tolls the statute of limitations only when, as a result of that concealment, the plaintiff fails to discover some critical fact. (*Rita M.* v. *Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453, 1460 [232 Cal.Rptr. 685].) As we concluded in part I, *ante*, Mrs. Goldrich suspected or should have suspected everything she needed to know by December 1984 at the latest, yet she failed to file suit until July 1986. Whether we speak in terms of accrual dates (that is, that the statute was not triggered until December 1984) or tolling (that the statute was tolled until December 1984), the effect is the same—the statute started to run (at the latest) in December 1984 and expired one year later. (See *Baker* v. *Beech Aircraft Corp.* (1974) 39 Cal.App.3d 315 [114 Cal.Rptr. 171, 91 A.L.R.3d 981]; and cf. *Baker* v. *Beech Aircraft Corp.* (1979) 96 Cal.App.3d 321 [157 Cal.Rptr. 779].)

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments, orders of dismissal and orders awarding costs in favor of defendants Natural Y Surgical Specialties, Inc., Cox-Uphoff International, Aesthetech Corporation and Dow Corning Corporation are affirmed. The order granting Mrs. Goldrich's motion for a new trial against Dow Corning is reversed and the cause is remanded to the trial court with directions to enter an order denying that motion. The parties are to pay their own costs of appeal.

Ortega, Acting P. J., and Masterson, J., concurred.

A petition for a rehearing was denied June 30, 1994, and the petition of appellant Sybil Niden Goldrich for review by the Supreme Court was denied August 25, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

*See footnote, *ante*, page 772.