Mario MIGLIORI, Irma
Migliori, Plaintiffs,

v.

BOEING NORTH AMERICAN,
INC., et al., Defendants.

No. CV 99–13192 ABC(RCX).

United States District Court,
C.D. California.

Sept. 11, 2000.

Weinreb, Weinreb & Mandell, Robert J. Mandell, Northridge, CA, plaintiffs.

Stephen Kristovich, Munger, Tolles & Olsen LLP, San Francisco, CA, for defendants.

## ORDER DENYING DEFENDANTS' MOTION PURSUANT TO FED.R.CIV. 56

COLLINS, District Judge.

Defendants' motion for summary judgment came on regularly for hearing before this Court on September 11, 2000. After considering the materials submitted by the parties, argument of counsel, and the case file, the Court DENIES Defendants' motion.

### I. Procedural Background

Plaintiffs Mario and Irma Migliori filed a complaint in state court on September 13, 1999 against various entity Defendants related to Boeing North American, Inc., and against three individuals, David Saxe, R.E. Alexander, and M.E. Remley. Plaintiffs subsequently filed a First Amended Complaint ("FAC") in November 1999. The entity [Illegible Text] ("Boeing") time-

ly removed to this Court. Boeing moved to dismiss on January 3, 2000 and was joined in its motion by Remey. The Court ruled on the motion to dismiss on April 17, 2000. *See Migliori v. Boeing North American, Inc.,* 97 F.Supp.2d 1001 (C.D.Cal.2000).

The Court granted Defendants' motion to dismiss in part. The Order dismissed M. Migliori's negligence claims because the Workers' Compensation Act precluded those claims. *Id.* at 1012. However, Migliori's claims based on Boeing's fraudulent concealment survived Defendants' motion. *Id.* Finally, I. Migliori's claim for loss of consortium also survived the motion to dismiss.

Boeing and Remey now move for summary judgment.[1] They assert that the statute of limitations bars Plaintiffs' remaining claims. Defendants also filed a request for judicial notice of three documents filed in the *Adams v. Boeing North American, Inc.* lawsuit. The Court takes judicial notice of these documents. Plaintiffs oppose Defendants' motion.

## II. Standard of Review

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)).

This means that, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [that party's] favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986) (emphasis in original).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.*

---

1. The Court notes that Plaintiffs have failed to provide any evidence that Defendant R.E. Alexander was served. Additionally, although Plaintiffs have served David Saxe, (Proof of Service filed 2/22/2000), Saxe has not filed any answer. At the hearing, Plaintiffs are ORDERED to SHOW CAUSE why this Court should not dismiss the claims against these individuals for failure to prosecute.

at 248, 106 S.Ct. 2505. However, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

## III.  Factual Background

M. Migliori worked for Boeing from 1958 until he was forced to retire in 1972. (Migliori Decl. ¶ 1.) Migliori's initial employment application reveals that he was 44–years old at the time and that he had obtained an eighth-grade education. (Sherer Decl.Ex. 2.) Migliori's primary function was the crushing and handling of radioactive material. (Migliori Decl. ¶ 1.) Migliori worked at the Powder Room of the Canoga Park facility. (*See id.*) He did not work at the Santa Susana Field Laboratory ("SSFL") and he did not work as an X-ray technician. (*Id.* at ¶ 4.) During the time that Migliori worked for Boeing, Boeing exposed Migliori to toxic levels of radioactive materials. (FAC ¶¶ 17, 22, 23.) [2]

Boeing monitored its employees' exposure to radiation and determined that it had exposed Migliori to excessive levels of radiation. (FAC ¶ 27; Pls.' Ex. 2 at 24.) However, Boeing did not inform Migliori about this excessive exposure while Boeing employed him. (Migliori Decl. ¶¶ 1, 3.) Instead, Boeing "continually reassured [Migliori] that [he] was protected from overexposure to radiation." (*Id.* at ¶ 1.) Boeing also told Migliori that any possible health threat from this low level of exposure "had been 'abated' by medical treatment proffered by" Boeing. (*Id.* at ¶ 3.) Given these assurances, Migliori believed that Boeing was taking all the necessary steps to insure workplace safety. (FAC ¶ 28.)

By 1968, Migliori was suffering from physical symptoms related to radioactive exposure. Boeing granted Migliori a medical leave but still did not provide any information concerning Migliori's massive exposure to radiation. Without this information, Migliori's doctors misdiagnosed his symptoms as psychosomatic and placed him in a psychiatric ward for nine months. (FAC ¶ 29.) Upon his release from the psychiatric ward, Migliori returned to work but continued to seek medical attention for his ailments. In 1970, a precancerous spinal cord tumor was removed from Migliori. (Migliori Decl. ¶ 2.) Boeing eventually laid Migliori off in 1972 without informing him of the radiation levels to which he was exposed. (FAC ¶ 29.) In 1994, Migliori was diagnosed with cancer (liposarcoma). (Migliori Decl. ¶ 3.)

### A.  September 1997 and the UCLA Health Study.

On September 11, 1997, UCLA released a health study concerning the exposure of Boeing employees to radiation. (Pls.' Stmnt. of Genuine Issues ("Facts") ¶ 1.) In and around September, Boeing sent its former employees a series of letters addressing the UCLA study. (*See* Lafflam Decl., Exs. 1–5.) Migliori, who at the time was living in Las Vegas, received these letters. (Migliori Decl. ¶ 4.)

The first letter simply disclosed that UCLA had conducted a study and provided a pamphlet describing in general the terminology of epidemiology studies. (Lafflam Decl.Ex. 1.) The second letter was dated September 11, 1997 and was the only letter personally addressed to Migliori. The letter revealed that Migliori's internal radiation exposure level was 132 mSv. The letter also stated:

> Your radiation exposure records were included in the study. The study found that Rocketdyne radiation workers had lower death rates from all causes and all cancers when compared to the U.S. pop-

---

**2.**  Generally, a plaintiff cannot rely on allegations in a complaint to oppose a summary judgment motion. However, although Defendants contend that Plaintiffs' claims are without merit, Defendants do not move on the ground that Migliori cannot establish a claim.

Indeed, they state that the Court "need never address" the merits of the claim because the claims are time-barred. (Defs.' Mot. at 1.) The Court, therefore, relies on allegations that Defendants do not challenge at this stage.

ulation. However, the study results suggest that workers with **over 200 mSV (20 rem) external** radiation exposure have a slightly elevated risk of contracting certain cancers. **Your exposure records indicate that you are not in this group.**

The study results also suggest that workers who received internal radiation exposures (calculated lung dose) have an elevated risk of contracting certain cancers. Experts in epidemiology, public health, and oncology, who conducted a technical review of the study on behalf of Rocketdyne, have said that all of the findings associated with internal exposures are questionable and difficult to interpret due to the limitations of the methodology used by UCLA to estimate internal exposures.

In comparison to other workers studies of this type, the internal doses in this study were small, as were the number of deaths among the internal radiation exposure group. UCLA cautions that the results for internal exposures are less reliable because of these low doses and small number of deaths. Researchers from other similar studies that looked at higher exposures and larger study groups have recognized the limitations of data associated with internal radiation exposure.

The health and safety of all our employees is and continues to be a primary concern.

(Lafflam Decl.Ex. 2 (emphasis in original).) The letter failed to provide an external radiation exposure level.

A third letter was also sent. This letter reiterated that Migliori's records "were used as part of a study of the health effects of exposure to radiation at the [SSFL].... The purpose of the study was to find out whether exposure to radiation at [Boeing] increases the risk of dying from cancer." (Lafflam Supp.Decl.Ex. 1.) The letter repeated the finding about external radiation that the second letter also described. It also stated that "[a]mong [Boeing] workers who were monitored for internal radiation, those who received a relatively higher dose (especially more than 30 mSv) had an increased risk of dying from cancers of the blood and lymph system, and upper aero-digestive tract cancers." (*Id.*)

Boeing sent a fourth letter to Migliori in September 1997 about the UCLA study. The letter stated that the "study included those SSFL workers ... who wore film badges during the period of 1950 to 1993" and "X-ray technicians working in Canoga Park." (Lafflam Decl.Ex. 5.) The letter described the UCLA study as "reassuring" because Boeing workers had a lower death rate when compared with the U.S. population or other worker groups. (*Id.*) The letter also questions the veracity of all internal radiation findings because an "outside panel of experts" concluded that the findings were "questionable and difficult to interpret." (*Id.*) Boeing also repeats that "the majority [of workers] received extremely low levels of radiation exposure" and that "[t]hroughout our operations, all our employees have always received less than the allowable radiation exposure levels." (*Id.*) Indeed, Boeing claimed to "have done everything possible to minimize and monitor radiation exposure to workers" and "to set more restrictive exposure limits." (*Id.*)

The fourth letter also "reaffirm[ed Boeing's] commitment to [its employees'] health and safety." (*Id.*) The letter also stated that Boeing's "primary concern will always be for the health and well-being of [its] employees." (*Id.*) Finally, the letter stated that the second letter "provide[d Migliori] with [Boeing's] most current exposure information." (*Id.*)

**B. October 1997 to July 1998.**

On October 15, 1997, Carolina Migliori, the Migliori's daughter, called Boeing on behalf of her father. (Facts ¶ 13.) Carolina informed Dawn Daw, Boeing's representative, that her father had cancer. Carolina also requested more information about medical monitoring, a copy of Migliori's medical records, and a copy of the

UCLA study. (*Id.*) Daw told Carolina that someone would contact her concerning her requests.

Daw also sent Carolina some additional documents and a copy of the UCLA study. (Facts ¶ 14.) The additional documents repeated the same information provided by the initial four letters. (*See* Daw Decl. Exs. 1–4.) One document, entitled "Presenting the Rocketdyne Worker Health Study," described in more detail the reasons why the internal exposure findings should be disregarded. (*Id.* at Ex. 2 at 43–44.) Another document stated that 400 mSv was the "lowest level where effects were seen in a meta-analysis of chronic nuclear worker exposure to low level radiation." (*Id.* at Ex. 3 at 55.) After a second phone call from Carolina on October 24, 1997, Daw sent a duplicate of this additional material to Migliori in his Las Vegas home. (Facts ¶ 15.)

In January 1998, Carolina initiated further attempts to get Migliori's medical records. That month, she sent four letters to individuals at UCLA and Boeing with a medical release form authorizing her to receive Migliori's medical records. The form stated: "This authorization is executed by the undersigned for the purpose of allowing an investigation and evaluation by my daughter and our representatives." (Facts ¶ 16.)

On June 15, 1998, Carolina received a response to her requests. James Barnes, a radiation safety officer at Boeing, responded to Carolina, disclosing that Migliori had received a dose of 16.35 mSv from external sources of radiation during his employment. (Barnes Decl.Ex. 1.) The letter also stated that Barnes was in the process of evaluating Migliori's internal radiation exposure based on data from Boeing's screening program. Barnes stated that he would forward his estimate of the internal radiation exposure upon completing his evaluation. (*Id.*)

On July 9, 1998, Boeing's Ronald Sherer also responded by letter to Carolina's January request. Sherer's letter stated:

In October 1997, Rocketdyne had retrieved all remaining medical records located at our offsite storage facility for the purpose of entering every employee's medical file into a newly created database. As of today, over 20,000 files have been entered into this database, inclusive of all terminated employees. I am sorry to report that a search of this database has not yielded your father's records. We know your father had a medical file at one time due to documentation of chest x-rays that were taken in late 1958 and the early 1960's. However, we believe these medical records were destroyed, in accordance with the company record retention policies of the era, following your father's last period of employment with the company. The record retention policy at that time was six years post employment end date.

(Sherer Decl.Ex. 2 at 189–90.) For some reason, Boeing had not destroyed Migliori's employment records. Thus, Sherer attached a copy of those records in his letter to Carolina.

## C. September 1998 to July 1999.

On September 3, 1998, the Miglioris sued Boeing in *Adams*. *Adams* was filed in Los Angeles Superior Court. (Facts ¶ 21.) The initial complaint stated that the Miglioris "first became aware that they might have sustained injuries as a result of their exposure to contamination arising from the conduct of defendants when the [UCLA study] was published." (*Adams* Complt. ¶ 39.) On October 14, 1998, the *Adams* Plaintiffs agreed to exclude any radiation exposure claims from the *Adams* lawsuit. (Facts ¶ 23.)

On September 9, 1998, Migliori filed a workers' compensation claim against Boeing. In that claim, Migliori seeks compensation for injuries arising out of his exposure to radiation while employed at Boeing. (Facts ¶ 22.)

In June 1999, Boeing produced, under subpoena, the so-called Skrable Report. (Facts ¶ 27.) The Skrable Report evaluat-

ed Migliori's exposure to radiation. (*Id.*) It was completed in August 1998. (Pls.' Decl.Ex. 2.) The Skrable Report concludes, based upon air sampling and bioassay data, that Migliori received exposures that exceeded regulatory limits. (Facts ¶ 29.) The report also concludes that "the chest counts may have underestimated by about tenfold the actual lung burden in the worker." (Pls.' Ex. 2 at 24.)

### D. September 1999.

On September 13, 1999, M. Migliori filed the instant action. I. Migliori joined this case in the FAC on November 15, 1999.

## IV. Analysis

### A. The Statute of Limitations, Discovery Rule, and Fraudulent Concealment.

■ Under the statute of limitations, a plaintiff must bring a cause of action within the applicable limitations period after accrual of the cause of action. *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 397, 87 Cal. Rptr.2d 453, 981 P.2d 79 (1999). Claims brought after the expiration of the limitations period are generally barred. A claim accrues upon the occurrence of the last element necessary to complete the claim. *Id.* The claim accrues under this traditional rule "even if the plaintiff is unaware of [the] cause of action." *Mangini v. Aerojet–General Corp.*, 230 Cal.App.3d 1125, 1149–50, 281 Cal.Rptr. 827 (1991). Plaintiffs do not contend that their claims are timely under the traditional rule. Thus, Plaintiffs' claim can survive only if an exception applies. Two exceptions are at issue in this case: the discovery rule and the fraudulent concealment exception.

### 1. The discovery rule.

■ The discovery rule postpones accrual of a claim until "plaintiff discovers, or has reason to discover, the cause of action." *Norgart*, 21 Cal.4th at 397, 87 Cal. Rptr.2d 453, 981 P.2d 79. A plaintiff discovers the claim when he or she at least suspects an injury that was caused by wrongdoing. *Id.; Jolly v. Eli Lilly & Co.*,

44 Cal.3d 1103, 1109–11, 245 Cal.Rptr. 658, 751 P.2d 923 (1988).

■ A person has reason to suspect an injury and wrongdoing where he or she has "notice or information of circumstances to put a reasonable person *on inquiry*." *Jolly*, 44 Cal.3d at 1110–11, 245 Cal.Rptr. 658, 751 P.2d 923 (internal quotations omitted; emphasis in original). A plaintiff is "held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." *Id.* at 1109, 245 Cal.Rptr. 658, 751 P.2d 923. "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim." *Id.* at 1111, 245 Cal.Rptr. 658, 751 P.2d 923. "So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." *Id.*

■ The plaintiff has the burden of showing that the discovery rule applies. *McKelvey*, 74 Cal.App.4th at 160, n. 11, 86 Cal.Rptr.2d 645; *Samuels v. Mix*, 22 Cal.4th 1, 10, 91 Cal.Rptr.2d 273, 989 P.2d 701 (1999). To successfully rely on the discovery rule, a plaintiff must prove "(a) lack of knowledge; (b) lack of a means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date); [and] (c) how and when he did actually discover the [claim]." *McKelvey*, 74 Cal. App.4th at 160 n. 11, 86 Cal.Rptr.2d 645 (quoting 3 Witkin Cal. Procedure *Actions* § 602 (4th ed.1996)).

### 2. The fraudulent concealment doctrine.

The Miglioris assert that the fraudulent concealment doctrine applies. Defendants claim the Miglioris' position is unavailing because the Miglioris were on inquiry notice outside the limitations period. (Defs.' Reply at 4–5.) In effect, Defendants argue that the discovery rule subsumes the fraudulent concealment doctrine. Defendants are wrong.

■ "A close cousin of the discovery rule is the 'well accepted principle . . . of fraudulent concealment.'" *Bernson v. Browning–Ferris Industries of Cal., Inc.,* 7 Cal.4th 926, 931, 30 Cal.Rptr.2d 440, 873 P.2d 613 (1994) (quoting *Sanchez v. South Hoover Hosp.,* 18 Cal.3d 93, 99, 132 Cal. Rptr. 657, 553 P.2d 1129 (1976)). Under the fraudulent concealment doctrine, a "defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which *the claim* is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." *Id.* (emphasis added).

> Like the discovery rule, the rule of fraudulent concealment is an equitable principle designed to effect substantial justice between the parties; its rationale "is that the culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an 'otherwise diligent' plaintiff in discovering his cause of action."

*Id.* (quoting *Sanchez,* 18 Cal.3d at 100, 132 Cal.Rptr. 657, 553 P.2d 1129). Moreover, the allegations necessary to rely on the fraudulent concealment doctrine and the discovery doctrine are very similar. "In order to establish fraudulent concealment, the complaint must show (1) when the fraud was discovered; (2) the circumstances under which the fraud was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts to put him on inquiry." *Baker v. Beech Aircraft Corp.,* 39 Cal.App.3d 315, 321, 114 Cal.Rptr. 171 (1974); *Kimball v. Pacific Gas & Electric Co.,* 220 Cal. 203, 215, 30 P.2d 39 (1934).

---

**3.** Thus, Defendants' reliance on various cases that address only the discovery rule is misplaced. *See Jolly v. Eli Lilly & Co.,* 44 Cal.3d 1103, 245 Cal.Rptr. 658, 751 P.2d 923 (1988); *O'Connor v. Boeing North American, Inc.,* 92 F.Supp.2d 1026 (C.D.Cal.2000); *Carey v. Kerr–McGee Chemical Corp.,* 999 F.Supp. 1109 (N.D.Ill.1998); *Mangini v. Aerojet–General Corp.,* 230 Cal.App.3d 1125, 281 Cal.Rptr. 827 (1991). Indeed, this Court in *O'Connor* expressly rejected the plaintiffs' fraudulent

### a. Notice and the fraudulent concealment doctrine.

It would appear that the pleading standard announced in *Baker* and *Kimball* supports Defendants' contention that once a plaintiff has inquiry notice, the fraudulent concealment doctrine cannot toll the limitations period. Defendants also point to two other cases that discuss notice in connection with the fraudulent concealment doctrine. Those cases, quoting a federal D.C. Circuit case, state: "[W]e pause to note an obvious, albeit often overlooked, proposition. The doctrine of fraudulent concealment . . . does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." *Rita M. v. Roman Catholic Archbishop of Los Angeles,* 187 Cal.App.3d 1453, 1460, 232 Cal.Rptr. 685 (1986) (quoting *Hobson v. Wilson,* 737 F.2d 1, 35 (D.C.Cir.1984)); *California Sansome Co. v. U.S. Gypsum,* 55 F.3d 1402, 1409, n. 12 (9th Cir.195) (quoting *Rita M.*).

In light of this language, it is not surprising that Defendants treat the fraudulent concealment doctrine as merely a restatement of the discovery rule. However, although analogous, the two doctrines constitute separate bases for tolling the statute of limitations. *See Bernson,* 7 Cal.4th at 931, 30 Cal.Rptr.2d 440, 873 P.2d 613.[3] Indeed, a close inspection of cases addressing fraudulent concealment reveals that "notice" or "inquiry" in the fraudulent concealment context plays a different role than "notice" or "inquiry" in the discovery rule context.

---

concealment theory because of a lack of evidence. 92 F.Supp.2d at 1040 n. 24. Similarly, *Carey* and *Mangini* involved circumstances where evidence was available in the public domain. Thus, once the plaintiffs in those cases suspected wrongdoing, a reasonable investigation would have disclosed the factual support for the claim. *See Carey,* 999 F.Supp. at 1116; *Mangini,* 230 Cal.App.3d at 1153, 281 Cal.Rptr. 827.

■ The discovery rule suspends accrual of a claim until the aggrieved person suspects that wrongdoing caused his or her injury. *Jolly,* 44 Cal.3d at 1109–11, 245 Cal.Rptr. 658, 751 P.2d 923. Under the discovery rule, a person is on "notice" when that suspicion arises. *Id.* A review of the fraudulent concealment cases shows that suspicion of wrongdoing does not foreclose application of the fraudulent concealment doctrine.

For instance, in *Kimball,* the plaintiff worked for Pacific Gas & Electric. While working at a power plant, the plaintiff was hit in the head by a falling 20–pound bolt that another worker had negligently placed on a platform. *Kimball,* 220 Cal. at 205–06, 30 P.2d 39. Clearly, at the time of the injury, the plaintiff suspected that wrongdoing caused his injury. The California Supreme Court, nevertheless, found that Defendant General Electric's efforts to conceal that it was the true employer of the negligent worker tolled the statute of limitations. *Id.* at 217–18, 30 P.2d 39.[4]

As the facts of *Kimball* demonstrate, the question is not whether a plaintiff was on notice of some wrongdoing. Instead, the question is whether the plaintiff had knowledge of facts, or should have known about facts, that placed him or her on notice of the specific cause of action. *See Kimball,* 220 Cal. at 210, 30 P.2d 39; *Pashley v. Pacific Electric Co.,* 25 Cal.2d 226, 229, 153 P.2d 325 (1944); *Bernson,* 7 Cal.4th at 931, 30 Cal.Rptr.2d 440, 873 P.2d 613; *Goldrich v. Natural Y Surgical Specialties, Inc.,* 25 Cal.App.4th 772, 784, 31 Cal.Rptr.2d 162 (1994) ("A defendant's fraudulent concealment tolls the statute of limitations only when, as a result of that concealment, the plaintiff fails to discover some critical fact.").

■ "[W]here fraud is established the statute is tolled only for as long as the plaintiff remains justifiably ignorant of the

facts upon which the cause of action depends; *discovery or inquiry notice of the facts terminates the tolling." California Sansome,* 55 F.3d at 1409 n. 12 (emphasis added) (quoting *Snyder v. Boy Scouts of America, Inc.,* 205 Cal.App.3d 1318, 1323, 253 Cal.Rptr. 156 (1988)). Thus, "when the defendant is guilty of fraudulent concealment of the cause of action the statute [of limitations] is deemed not to become operative until the aggrieved party discovers the existence of *the cause of action." Pashley,* 25 Cal.2d at 229, 153 P.2d 325 (emphasis added).

*Rita M.* does not call into doubt this standard. In *Rita M.,* the plaintiff, Rita M., sued the archdiocese because various priests had sex with her and one had impregnated her. Rita M. attempted to rely on the fraudulent concealment doctrine based on the priests' "conspiracy ... to maintain secrecy regarding the sexual relations with the priests." *Rita M.,* 187 Cal.App.3d at 1460, 232 Cal.Rptr. 685. As the court pointed out, however, Rita M. "was at all times aware of the relevant facts" that disclosed her cause of action. *Id.* at 1461, 232 Cal.Rptr. 685. Thus, Rita M. was not merely aware of facts that put her on notice of some possible wrongdoing that resulted in her injury. Rita M. was aware of facts that supported the specific causes of action that she untimely brought.

Any remaining ambiguity in *Rita M.'s* use of the phrase "notice of a potential claim" fades away after considering the source of the phrase: *Hobson v. Wilson,* 737 F.2d 1, 35 (D.C.Cir.1984). The *Hobson* court made clear that "notice" did not mean a simple suspicion of wrongdoing:

> By "notice," we refer to an awareness of sufficient facts to identify a particular cause of action, be it a tort, a constitutional violation or a claim of fraud. We do not mean the kind of notice—based

4. *Baker's* fact pattern is also similar to *Kimball.* In *Baker,* the plaintiffs were suing an airline manufacturer for injuries resulting from an airplane accident. *Baker,* 39 Cal. App.3d at 317, 114 Cal.Rptr. 171. The Cali-

fornia appellate court found that the limitations period was tolled by the defendants' concealment of a dangerous defect of the aircraft.

on hints, suspicions, hunches or rumors—that requires a plaintiff to make inquiries in the exercise of due diligence, but not to file suit.

*Id.* at 35.

Thus, under both the fraudulent concealment doctrine and the discovery rule, a trier-of-fact must look to see what information the plaintiff knew or should have known in the exercise of due diligence. However, for purposes of the fraudulent concealment doctrine, the trier-of-fact must determine whether that information would have disclosed the specific cause of action (or claim) at issue. The fraudulent concealment doctrine tolls the running of the statute of limitations if that information would not have disclosed the specific claim.

### b. Reasonable diligence and the defendant's conduct.

■ The fraudulent concealment doctrine, however, does not waive the requirement that a plaintiff exercise reasonable diligence in attempting to discover facts about suspected wrongful conduct. *Bernson,* 7 Cal.4th at 936, 30 Cal.Rptr.2d 440, 873 P.2d 613.

> When a plaintiff receives information sufficient to put him on inquiry notice, the statute of limitations will begin to run if the plaintiff does not reasonably exercise due diligence in conducting the inquiry. In other words, he is held to be on notice of all facts he could have learned through a reasonably diligent inquiry.

*Hobson,* 737 F.2d at 35 n. 107; *accord State of Texas v. Allan Construction Co., Inc.,* 851 F.2d 1526, 1533 (5th Cir.1988). "Lack of knowledge alone is not sufficient to stay the statute; a plaintiff may not disregard reasonably available avenues of inquiry which, if vigorously pursued, might yield the desired information." *Bernson,* 7

Cal.4th at 936, 30 Cal.Rptr.2d 440, 873 P.2d 613. Thus, under the fraudulent concealment doctrine, a plaintiff is still under a duty to seek out the facts if a suspicion exists.

■ Nevertheless, the limitations period is tolled if the defendant precludes the plaintiff from finding the facts that would give notice of the particular claim. For the statute of limitations to be tolled, the defendant must be responsible for plaintiff's inability to find the relevant facts. If the plaintiff is unable to learn of the relevant facts through no fault of the defendant, the fraudulent concealment doctrine does not apply. The doctrine's "rationale 'is that the culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an "otherwise diligent" plaintiff in discovering his cause of action.'" *Bernson,* 7 Cal.4th at 931, 30 Cal.Rptr.2d 440, 873 P.2d 613 (quoting *Sanchez,* 18 Cal.3d at 100, 132 Cal.Rptr. 657, 553 P.2d 1129). "The rule of fraudulent concealment is applicable whenever the defendant intentionally prevents the plaintiff from instituting suit." *Id.* at 931 n. 3, 30 Cal.Rptr.2d 440, 873 P.2d 613.

■ With this basic understanding of the role of these tolling doctrines, the Court now turns to the facts presented in this case.[5]

### B. Application of the Discovery Rule.

In September 1997, Boeing sent M. Migliori a series of letters that described the UCLA study. The UCLA study concluded that Boeing workers who had been exposed to certain levels of radiation were at risk of contracting certain forms of cancer. Shortly after receiving this information, the Miglioris began investigating the link between M. Migliori's cancer and the ra-

---

5. The Court notes that Plaintiffs also half-heartedly argue that M. Migliori's filing of a workers' compensation claim tolled the statute of limitations. However, the remaining claims are distinct from the workers' compensation claim. Accordingly, the filing of the workers' compensation claim did not toll the limitations period. *See Aerojet General Corp. v. Superior Court,* 177 Cal.App.3d 950, 223 Cal.Rptr. 249 (1986).

dioactive exposure to which Boeing subjected him.

■ Thus, at least as of September 1997, the Miglioris suspected that M. Migliori's cancer was a result of some wrongdoing by Boeing. If they actually did not so suspect, they should have had such suspicions. Accordingly, under the discovery rule, the Migliori's claims accrued in September 1997.

■ The Miglioris argue that, even if accrual is deemed to have occurred in September 1997, the instant complaint was timely filed. According to the Miglioris, their claims are for fraudulent concealment and the limitations period for fraud is three years. *See* Cal.Civ.Proc.Code § 338 (limitations period for fraud). The Migliori's reliance on § 338, however, is misplaced. In *Aerojet–General*, the California Court of Appeals found that the limitations period for a claim that fraudulent concealment aggravated a worker-related injury was one year. *See Aerojet General*, 177 Cal.App.3d at 954 n. 2, 223 Cal.Rptr. 249.

Thus, under the discovery rule, the Miglioris' claims are time-barred.

## C. Application of the Fraudulent Concealment Doctrine.

The Miglioris, however, argue that the fraudulent concealment doctrine tolled the limitations period on their claims. The Court agrees.[6]

The Miglioris contend that Defendants fraudulently concealed that Boeing exposed M. Migliori to an excessive level of radiation that exceeded regulatory limits. (*See* FAC ¶¶ 27, 49, 52.) Defendants argue that the Miglioris were on notice of any alleged fraudulent concealment be-

cause they were clearly on notice of the effect of M. Migliori's exposure as of September 1997. As evidence, Defendants point to the Miglioris' involvement in *Adams* and M. Migliori's workers' compensation claim.

■ Viewed in the light most favorable to the Miglioris, however, the *Adams* case does not support a finding that the Miglioris knew, or should have known, about Defendants' fraud in concealing the fact that Boeing exposed M. Migliori to massive amounts of radioactive exposure. The *Adams* lawsuit did not involve radioactive exposure. Moreover, M. Migliori's effort to secure workers' compensation for the radioactive exposure supports an inference that he did not believe that the *Adams* lawsuit was the vehicle for his work-related radioactive exposure.

As to the workers' compensation claim, the fallacy of relying on that claim is demonstrated by Defendants' own argument. Defendants point out, correctly, that the fraudulent concealment claim and the underlying workers' compensation claim are two distinct claims dealing with distinct injuries. *See Aerojet General*, 177 Cal. App.3d at 955–56, 223 Cal.Rptr. 249; *cf.* Cal. Labor Code § 3602(b)(2) (fraudulent concealment exception to workers' compensation exclusivity). Indeed, such a conclusion was necessary to allow the *Aerojet–General* court to conclude that the filing of a workers' compensation claim did not toll the statute of limitations on a fraudulent concealment claim. Thus, the fact that Migliori filed a workers' compensation claim does not necessarily mean that he was on notice of facts that would support a fraudulent concealment claim.

---

6. However, the Court also notes that neither side addresses in any substantial manner I. Migliori's loss of consortium claim. Clearly, to the extent that her claim was based on an injury that was compensable by the workers' compensation scheme, it is precluded. *See* Snyder v. Michael's Stores, Inc., 16 Cal.4th 991, 998–99, 68 Cal.Rptr.2d 476, 945 P.2d 781 (1997). As with Defendants' motion to

dismiss, the Court assumes that the loss of consortium claim is limited to the aggravation, caused by Defendants' fraudulent concealment, of the work-related injury. *See* 97 F.Supp.2d at 1012. The Court expects the parties to do a better job on the loss of consortium claim in any future motion or pretrial documents.

Moreover, the evidence presented supports an inference that Migliori was not aware of any facts putting him on notice that Boeing had misrepresented his level of exposure. Obviously, at the time Migliori filed the workers' compensation claim, he suspected that his exposure might have caused his cancer. He also knew that Boeing had exposed him to radiation. However, he never knew of the excessive amount until June 1999.

Even the material provided by Boeing during 1997 and 1998 did not disclose the high level of radiation to which Boeing exposed Migliori. Boeing sent Migliori his internal and external radiation levels in 1997 and 1998 respectively. However, Boeing presents no evidence that these numbers necessarily, or reasonably, disclosed that it exposed Migliori to excessive amounts of radiation exceeding regulatory limits. Moreover, based on the information provided by Boeing, a reasonable person could have concluded that the exposure levels did not present a substantial risk or an excessive level of radiation exposure.

 Additionally, the material provided by Boeing repeatedly reassured Migliori that Boeing cared about its retiree's health, that Boeing never exposed its employees to excessive amounts of radiation, and that any employee's exposure to radiation was within regulatory limits. All of this information was consistent with the representations that Boeing made to Migliori when he was an employee. Thus, a trier-of-fact could reasonably conclude that Migliori did not suspect that Boeing had been lying to him until he finally received a report stating that Boeing had underestimated Migliori's exposure by tenfold and that Boeing had exposed Migliori to levels that exceeded regulatory limits.

A trier-of-fact could also conclude that Migliori took reasonable efforts to learn facts after he suspected that Boeing's wrongful conduct may have caused his cancer. The Court notes that Defendants present no evidence that Migliori could have determined from any other source that Boeing had exposed him to excessive levels of radiation. Because Boeing had this information and misrepresented it to Migliori, a trier-of-fact could conclude that Defendants were at fault for Migliori's inability to earlier learn the facts related to the degree of exposure.

## V. Conclusion

For the reasons articulated herein, Defendants have failed to satisfy their burden of showing that Plaintiffs' remaining claims are time-barred. Accordingly, the Court DENIES Defendants' motion.

**SO ORDERED.**