John **GARAMENDI, as Insurance Commissioner of the State of California and as Conservator, Rehabilitator and Liquidator of the Estate of Executive Life Insurance Company, Plaintiff,**

v.

**SDI VENDOME S.A., et al., Defendants.**

**No. CV 02–5983 AHM(CWx).**

United States District Court, C.D. California.

Aug. 4, 2003.

---

Cedric C. Chao, Gloria Young Eun Lee, Morrison & Foerster, San Francisco, CA, Harry J. Levine, Steven J. Green, California Dept. of Insurance, San Francisco, CA, George B. Newhouse, Jr., Thelen, Reid & Priest, Los Angeles, CA, Gary L. Fontana, Kathryn E. McQueen, Karl D. Belgum, Jennifer Robin McGlone, Thelen, Reid & Priest, San Francisco, CA, for Plaintiff.

Jerome H. Friedberg, Stephan, Oringher, Richman & Theodora, Los Angeles, CA, for SDI Vendome, S.A. and Alain Mallart.

Robert S. Warren, Stephen R. Smerek, Gibson, Dunn & Crutcher, Los Angeles, CA, Robert L. Weigel, Marshall R. King, Michael G. Honeymar, Jr., Gibson, Dunn & Crutcher, New York City, for Financiere du Pacifique, SNC.

Marc Marmaro, Matthew David Hinks, Katherine J. Kunberger, Jeffer, Mangels, Butler & Marmaro, Los Angeles, CA, Martin Flumenbaum, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Jonathan H. Anschell, White, O'Connor, Curry & Avanzado, Los Angeles, CA, for Fimilac, S.A. and Marc Ladriet De Lacharriere

## ORDER GRANTING DEFENDANT LACHARRIERE'S MOTION FOR SUMMARY JUDGMENT

MATZ, District Judge.

This matter is before the Court on Defendant Marc Ladreit de Lacharriere's Motion for Summary Judgment. For the reasons that follow, Lacharriere's Motion is GRANTED.

### INTRODUCTION

This action is another chapter in the ongoing saga of the Executive Life Insurance Company ("ELIC" or "Executive Life"), a California insurance company that collapsed more than ten years ago. In 1995, the California Court of Appeal summarized ELIC's dramatic fall as follows:

> ELIC, a California-based life insurance company, had in the 1980's issued conventional life insurance policies and annuities and also innovative annuity-like products known as Guaranteed Investment Contracts (GICs). These included contracts funding (1) pension and profit sharing plans (Pension–GICs), (2) bond liability of municipalities (Muni–GICs), and (3) structured settlements reached in tort cases; as well as single premium immediate annuities certain (SPIAs) and single premium deferred annuities (SPDAs).

> As required by law, ELIC established reserves representing its future liabili-

ties on these contracts. The reserves were funded by investments, primarily in high yield fixed income securities with no, or very low, credit ratings. By 1991 the market in these high-risk bonds had crashed. A large proportion of the bonds in ELIC's portfolio were in default, and the remainder had suffered serious declines in value so that ELIC reserves were grossly inadequate. The reserves faced a further serious deterioration because of the equivalent of a "run on the bank." Policyholders whose contracts permitted were cashing out their contracts with ELIC, requiring ELIC to dispose of its better investments to raise necessary cash.

*In re Executive Life Ins. Co.,* 32 Cal. App.4th 344, 355–56, 38 Cal.Rptr.2d 453 (1995).

In April 1991, the California Insurance Commissioner (then and now, John Garamendi) stepped in, seized ELIC's assets and placed the insolvent company in conservatorship. Lacharriere's Statement of Undisputed Facts and Conclusions of Law ("SUF") ¶ A; Commissioner's Statement of Genuine Issues of Material Fact ("SGI") at 4–5 (Lacharriere's ¶ A not listed among Commissioner's disputed facts). *See also* Compl. ¶ 14. The Commissioner crafted a rehabilitation plan for Executive Life and, after a lengthy bidding process, authorized the transfer of ELIC's junk bond portfolio to Altus Finance S.A. ("Altus") in March 1992 and transferred ELIC's insurance assets to a company called Aurora in September 1993. SUF ¶ A; SGI at 4–5. *See also* Compl. ¶ 34, ¶ 36.

Shares in the newly formed Aurora were held by a holding company called New California Life Holdings, Inc. ("New California"), which was in turn owned and controlled by a group of European investors led by MAAF Assurances ("MAAF") and including Financiere du Pacifique S.N.C. ("Finapaci"). *See* SUF ¶ A; SGI at 4–5; Third Amended Compl. in *Garamendi v. Altus Finance S.A., et al.,* Case No. CV99–389 (C.D.Cal.) ¶ 30 (attached as Exh. 7 to the Decl. of Martin Flumenbaum) (hereinafter *"Altus* TAC"). At the time Finapaci was owned by Fimalac S.A., a French investment company owned and controlled by Defendant French investor Marc Ladreit de Lacharriere. SUF ¶ A; SGI at 4–5. Compl. ¶¶ 5–7.

According to the complaint in this and a related case, *Garamendi v. Altus, supra,* the various members of the MAAF-led investor group emerged victorious in the ELIC bidding process only because of a massive fraud they perpetrated against the Commissioner. Compl. ¶¶ 14–37. Although members of the investor group, including Lacharriere and his company, Finapaci,[1] held themselves out during the bidding process as "independent" investors, they had (at least according to the Commissioner) already entered into secret *"contrats de portage"*[2] with Altus and Credit Lyonnais by which they promised to "act as fronts or 'porteurs' for Altus and Credit Lyonnais with the understanding that any interest that they acquired in Aurora ... would be held solely for the benefit of Altus and Credit Lyonnais." Compl. ¶ 20. In *Altus,* the Commissioner has alleged that these secret fronting arrangements were designed to avoid California and federal laws that prohibited Altus and Credit Lyonnais from owning or controlling

---

1. The Commissioner alleges that Lacharriere created Finapaci in furtherance of the fraud. Compl. ¶ 23.

2. In his Second Amended Complaint in *Altus,* the Commissioner defines *"contrat de portage"* as follows: *"contrat de portage"* is *"a* French term referring to contracts which can be used to establish secret fronting relationships ...." Second Amended Compl. in *Altus* ¶ 28 (attached as Exh. 5 to the Flumenbaum Decl.) [hereinafter *"Altus* SAC"].

ELIC or its successor insurance company, Aurora. *Altus* TAC ¶ 30.

## PROCEDURAL BACKGROUND

The Commissioner sued many of the companies, corporate officers and investors who were involved in the alleged ELIC fraud in *Altus*, the related action filed by the Commissioner in February 1999 and removed to this Court in March 1999. The Commissioner did not file this very similar case, which names additional members of the MAAF-led investor group as defendants, until July 31, 2002. Although this case is relatively recent compared to *Altus*, it already has generated significant motion practice. The following claims against Lacharriere survived Defendants' initial motions to dismiss: fraud by intentional misrepresentation, fraud by negligent misrepresentation, fraud by suppression of facts, constructive fraud and fraud by conspiracy.

Lacharriere now moves for summary judgment on all claims against him. He contends that the Commissioner's claims are barred by the applicable statute of limitations.

## MOTION STANDARDS

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir.2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (*citing Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir.1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence

'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

## TIMELINE [3]

■ The facts relevant to this motion are presented in the following timeline:

| Date | Event |
| --- | --- |
| 1. April 1991 | The Commissioner is appointed ELIC's conservator. Compl. ¶ 14. |
| 2. March 1992 | The Commissioner authorizes the transfer of ELIC's junk bonds to Altus. *Id.* ¶ 34. |
| 3. September 1993 | The Commissioner transfers ELIC's insurance assets to Aurora. *Id.* ¶ 36. |
| 4. June 23, 1998 | (a) The Commissioner's senior staff first learned of secret *portage* contracts between Altus and one or more members of the MAAF-led investor group. Decl. of Gary L. Fontana ¶ 40; Compl. ¶ 40.[4] (b) The Commissioner is "suspicious of all of the investors once he learn[s] that MAAF acted as a mere front for Altus—[the Commissioner] has made repeated statements to that effect." Commissioner's Opp. to Lacharriere's Motion to Dismiss at 7:6–8.[5] (c) The Commissioner "immediately [begins] investigating whether the remaining investors in the MAAF group were also *porteurs*...." *Id.* at 3:27–4:2.[6] |
| 5. February 18, 1999 | The Commissioner files his initial complaint in state court, naming Altus Finance S.A., CDR Enterprises, MAAF, MAAF Vie S.A., Omnium Geneve S.A., Credit Lyonnais S.A., Jean–Claude Seys, Jean–Francois Henin, Jean Irigoin and Does 1–500 as defendants. |
| 6. April 15, 1999 | RoNo, LLC files a first amended *qui tam* complaint (in state court) on behalf of the State of California and the Commissioner |

**3.** The following facts either are undisputed or, if disputed or not agreed to, represent the Commissioner's contention, thus giving the non-moving party the benefit of having his evidence believed.

**4.** Both Lacharriere and the Commissioner appropriately appear to assume that knowledge on the part of members of the Commissioner's senior staff or Department of Insurance ("DOI") lawyers may be imputed to the Commissioner. *See, e.g., Stalberg v. Western Title Ins. Co.*, 27 Cal.App.4th 925, 930, 32 Cal. Rptr.2d 750 (1994) (imputing knowledge of plaintiffs' attorney to plaintiffs themselves in order to determine when claims accrued).

**5.** The Court may, in its discretion, treat statements made in briefs as binding judicial admissions. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir.1988). Although the same lawyer who made this statement now states that the Commissioner did not have evidence in July of 1999 sufficient to *establish* Lacharriere's fraud, the Commissioner has not attempted to deny, withdraw or explain away that lawyer's earlier statements. *Cf. Sicor Limited v. Cetus Corp.*, 51 F.3d 848, 859–60 (9th Cir.1995) ("Where ... the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight.").

**6.** In ruling on motions to dismiss in this case, the Court stated on January 7, 2003 that in light of these statements by the Commissioner's counsel, "the Commissioner cannot now claim the benefit of the discovery rule [concerning the statute of limitations] to delay accrual of his claims beyond June 1998."

alleging, *inter alia,* that Altus and Credit Lyonnais executed secret *portage* agreements "with MAAF and *other nominal members of the bidding syndicate* which secretly gave Credit Lyonnais and Altus total control over the ELIC transactions while falsely portraying ... that MAAF and *the other members of the syndicate* would own and control the interests they were seeking to acquire." First Amended Complaint in *State of California ex rel. RoNo, LLC v. Altus Finance S.A.,* Case No. 301344 (Super.Ct.) ¶ 13 (emphasis added) (attached as Exh. 3 to the Decl. of Martin Flumenbaum).

7. June 18, 1999   The Commissioner files his first amended complaint in *Altus,* alleging, *inter alia:* "Altus entered into a *contrat de portage* and other secret agreements with MAAF, Omnium Geneve *and the other entities* which made it appear as if MAAF *and the others* were legitimate, independent investors and participants in the bidding syndicate.... In reality, MAAF's participation *as well as that of the other members of the so-called 'Altus/MAAF bidding syndicate'* was a sham designed to mislead the Commissioner...." First Amended Compl. in *Altus* ¶ 18 (emphasis added) (attached as Exh. 4 to the Flumenbaum Decl.).

8. May–July 15, 1999   (a) Artemis S.A. ("Artemis") produces to the Commissioner a 1995 letter written by Patricia Barbizet, an Artemis representative.[7] In her letter, Barbizet states that Finapaci purchased its shares of New California "within the framework" of a *portage* agreement with Credit Lyonnais and that Artemis purchased Finapaci in order to gain control of its Aurora shares. Lacharriere's July 2, 2003 "Submission." *See also* Commissioner's Opp. at 6; Fontana Decl. Exh. F (chart reflecting Artemis document production). (b) Harry LeVine, a lawyer in the DOI and one of the lawyers representing the Commission in this action, reviews the Barbizet letter. Dep. of Harry LeVine at 204:9–207:9; 219:3–221:15 (attached as Exh. 3 to the Reply Decl. of Martin Flumenbaum).[8]

9. September 15, 1999   Commissioner files a second amended complaint in *Altus,* alleging, *inter alia:* "On information and belief, a *contrat de portage* ... was also entered into between Altus and Omnium Geneve and between Altus *and each of the other entities* that were members of the MAAF syndicate at the time the Altus/MAAF proposal was submitted to the Commissioner...." *Altus* SAC ¶ 28 (emphasis added).

10. February 16, 2000   The Commissioner files his third amended complaint in *Altus* alleging, *inter alia:* (a) "On information and belief, a *contrat de portage* ... was also entered into between Altus and Omnium Geneve and between Altus *and each of the other entities* that were members of the MAAF syndicate...." *Altus* TAC ¶ 34 (emphasis added).

---

**7.** The Commissioner has previously described Artemis's role in the alleged fraud scheme as follows:

> In the summer of 1992 Credit Lyonnais and Altus began searching for a single partner who could replace Altus' numerous partners in [the] illegal scheme. They found their man in ... Francois Pinault, a wealthy French businessman who at the time was heavily indebted to Credit Lyonnais. In December 1992, Credit Lyonnais and Pinault created a joint venture called Artemis, S.A. in which Pinault would nominally own 75% and Altus/Credit Lyonnais 25%. At the same time they created Artemis, Credit Lyonnais agreed to sell Artemis its secret controlling interest in [Aurora].

Commissioner's Opp. to Aurora Motion to Dismiss in *Altus* at 9 (attached as Exh. 11 to the Flumenbaum Decl.).

**8.** The precise date of Mr. LeVine's review is not clear, but there is no dispute that it was on or before July 15, 1999.

(b) "The *contrats de portage* were intended to and did make it appear as if MAAF *and the other members of the MAAF syndicate* were legitimate, independent investors ... while secretly giving Altus and Credit Lyonnais total ownership and control over ELIC's bond portfolio and insurance business. In reality, MAAF's participation, *as well as that of the other syndicate members,* was a sham designed to mislead the Commissioner...." *Id.* ¶ 35 (emphasis added).

11. August 1999–August 2000    On several occasions, counsel for the Commissioner meets or speaks over the telephone with counsel for Jean Francois Henin, defendant in the *Altus* action. During these meetings, Henin, "speaking through his attorneys, sa[ys] on several occasions that ... there were no agreements between Altus [ ] and Credit Lyonnais and ... Lacharriere or [his] compan[y]...." Fontana Decl. ¶¶ 26–27.

12. October 6, 2000    The Commissioner files his opposition to defense motions to dismiss in *Altus.*

(a) In his opposition, the Commissioner claims that Altus and Credit Lyonnais created an investment fund called Apollo Investment Fund II, L.P. ("Apollo II") in which they would allegedly retain only a minority interest. The creation of Apollo II allowed Credit Lyonnais, at least according to the Commissioner, to retain control over a lucrative part of the ELIC bond portfolio—control prohibited by the Bank Holding Company Act. Commissioner's Opp. at 6:3–10 & n. 9 (attached as Exh. 11 to the Flumenbaum Decl.).

(b) The Commissioner's opposition also states: "The nominal majority owners of Apollo II were a new group of fronting companies owned by many of the same French businessmen who participated in the fraud on the Commissioner and the Department of Insurance. *For example, Marc Ladreit de Lacharriere, a member of the Board of Directors of Credit Lyonnais, acted as a front in the ELIC transaction through his company. [Finapaci] and as a front in Apollo II through his company Finam."* *Id.* & n. 9 (emphasis added).

13. November 20, 2000    The Commissioner files a memorandum in support of his motion for issuance of a letter of request in *Altus.* In his memorandum, the Commissioner states that when the ELIC insurance business was transferred to Aurora in September 1993, "MAAF Vie became one of five co-owners: the five consisted of the four co-conspirators (MAAF, Omnium Geneve, SDI Vendome, *and Finipaci*) who held their interests under the control of Altus and Credit Lyonnais through the secret portage agreements...." Commissioner's Mem. at 8:17–24 (attached as Exh. 12 to the Flumenbaum Decl.) (emphasis added).

14. December 2000–December 2001    Counsel for the Commissioner meets or speaks with Alain Mallart on at least six occasions. During each of these meetings, counsel for the Commissioner is "told that Mr. Mallart had 'no information' about the roles played by any of the other members of the MAAF investor group." Fontana Decl. ¶ 32.

15. December 13, 2001    (a) During the deposition of Denis Lion the Commissioner learns of unwritten arrangements ("housekeeping accounts") that Credit Lyonnais, for whom Lion had worked, could use to control its *porteurs,* even absent a written *portage* agreement. Opp. at 2:9–14; Lion Dep. at 608:1–615:5 (attached as Exh. I to the Fontana Decl.).

16. December 14, 2001    Counsel for the Commissioner attends a meeting where counsel for Defendant Alain Mallart states that Mallart knew Lacharriere

entered into a *portage* agreement with Credit Lyonnais. Fontana Decl. ¶ 33.

17. July 31, 2002   The Commissioner files his complaint in this action.

## ANALYSIS

The Commissioner's fraud claims are all subject to the three-year statute of limitations in Cal.Code Civ. Proc. § 338(d).[9] Lacharriere contends that these claims are time-barred because they accrued in 1998 or early 1999—more than three years before the Commissioner filed his complaint on July 31, 2002. The Commissioner offers two responses: First, he argues that his claims against Lacharriere did not accrue until December, 2001. Second, he argues that even if his claims did accrue more than three years before he filed his complaint, fraudulent concealment tolled the statute of limitations.

### I.  General Principles

" 'Statute of limitations' is the 'collective term . . . commonly applied to a great number of acts,' or parts of acts, that 'prescribe the periods beyond which' a plaintiff may not bring a cause of action." *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 395, 87 Cal.Rptr.2d 453, 981 P.2d 79 (1999) (quoting 3 Witkin, Cal. Procedure § 405 (4th ed.1996)). Statutes of limitations "protect defendants from the stale claims of dilatory plaintiffs" and encourage "plaintiffs to assert fresh claims against defendants in a diligent fashion." *Id.* "Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action." *Id.* at 397, 87 Cal.Rptr.2d 453, 981 P.2d 79.

A cause of action ordinarily accrues when it is "complete with all of its elements." *Id.* If this standard rule of accru-

al were applied here, the Commissioner's claims clearly would be time-barred. The knowingly fraudulent statements alleged in the Complaint all were made before September 1993, *see* Compl. ¶¶ 18–32, and the Commissioner relied on them to his detriment in September 1993 when he transferred ELIC's insurance assets to Aurora. Compl. ¶ 36. Although the Commissioner has proffered imprecise theories of damage, he has taken the position that he is entitled to recover as fraud damages the amount he spent in negotiations leading up to the 1992 and 1993 Altus/MAAF transactions. Commissioner's Damages Statement (filed March 3, 2003) at 8. Thus, by September 1993, the Commissioner's fraud claims were complete with all of their elements. 5 Witkin, Summ. of Cal. Law § 676 (9th ed. 1988) ("The elements of fraud . . . are (a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage.").

### II.  The Discovery Rule

The "discovery rule" is an exception to the standard rule of accrual. *Norgart*, 21 Cal.4th at 397, 87 Cal.Rptr.2d 453, 981 P.2d 79. "It postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* Under California law, a plaintiff is held to "discover[ ]" her cause of action when she "suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Jolly v. Eli Lilly & Co.*, 44

---

**9.** Although the parties disagree as to whether a two-year or three-year statute of limitations applies to the Commissioner's negligent misrepresentation claim, the Court need not re-solve that dispute in ruling on this motion. The Court will assume for purposes of this Order that all of the Commissioner's claims are subject to a three-year limitations period.

Cal.3d 1103, 1110, 245 Cal.Rptr. 658, 751 P.2d 923 (1988). *See also Norgart*, 21 Cal.4th at 397, 87 Cal.Rptr.2d 453, 981 P.2d 79; *Kline v. Turner*, 87 Cal.App.4th 1369, 1373–75, 105 Cal.Rptr.2d 699 (2001) (applying this standard to fraud claims). The plaintiff

> need not be aware of the specific "facts" necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

*Jolly*, 44 Cal.3d at 1111, 245 Cal.Rptr. 658, 751 P.2d 923. *See also Norgart*, 21 Cal.4th at 398, 87 Cal.Rptr.2d 453, 981 P.2d 79.

▌ In this case, counsel for the Commissioner has stated that the Commissioner suspected and immediately began investigating all members of the MAAF-led investor group in June 1998, upon learning at that time of secret *portage* agreements involving at least some of the investor group members in June 1998.[10] *See* Timeline, *supra*, ¶ 4 (citing Commissioner's Opp. to Lacharriere's Motion to Dismiss). Although the Commissioner may not have been able to *prove* Lacharriere's fraud in

June 1998, *see* Fontana Decl. ¶ 16, a plaintiff "need not know the specific facts necessary to *establish* the cause of action" in order for his claims to accrue. *Norgart*, 21 Cal.4th at 396, 87 Cal.Rptr.2d 453, 981 P.2d 79 (emphasis added) (internal quotation marks omitted).[11] Under California's "discovery rule," the Commissioner's June 1998 "suspicion of wrongdoing" started the statute running. *See Norgart*, 21 Cal.4th at 405–06, 87 Cal.Rptr.2d 453, 981 P.2d 79.

### III. The *Whitfield* Exception to the Discovery Rule

The Commissioner argues that his claims did not accrue until December, 2001, when, through what he describes as his own diligent investigation, he learned of unwritten "housekeeping accounts" that Credit Lyonnais used to enforce oral portage agreements. *See* Commissioner's Opp. at 2 ("The mystery of the missing Lacharriere portage was not solved until December 2001, when Denis Lion testified that unwritten *compte de menagere* relationships ('housekeeping accounts') existed at the bank which functioned like an unwritten portage."); *id.* at 16 ("The Commissioner's diligent investigation did not yield evidence of 'the facts constituting the fraud' by Lacharriere until December 2001."). *See also id.* ("Coincidentally, on

---

**10.** Now, however, in a declaration filed in opposition to this motion, that same lawyer, Gary L. Fontana, states that the Commissioner "commenced an investigation" into Lacharriere's and Finapaci's involvement in February 1999, after the Commissioner filed his complaint in *Altus*. Decl. of Gary L. Fontana ¶ 12. Mr. Fontana does not attempt to explain the apparent contradiction between this claimed start date for the Commissioner's investigation and his earlier statement that he began investigating all of the MAAF-group members, who included the Defendants named in this action, "immediately" after learning of the *portage* contracts in June 1998.

Even if the Commissioner began to suspect and investigate Lacharriere in February 1999,

however, his claims still would have accrued more than three years before he filed his complaint on July 31, 2002.

**11.** At oral argument the Commissioner again argued that he did not discover evidence sufficient to prove his case or to survive summary judgment until December 2001. But California law simply does not delay accrual indefinitely in order to allow a plaintiff to obtain all needed evidence before filing her complaint. The Commissioner could have obtained additional evidence through the discovery process and, as will be discussed below, his complaint might still have been timely if it had been filed soon after the Commissioner obtained the December 2001 evidence that he believes will prove his case.

that same date, the Commissioner learned that Lacharriere had admitted to being a porteur in a conversation with another defendant."). In other words, the Commissioner argues that the limitations period began to run not when he *suspected* Lacharriere but when his diligent investigation produced *evidence* to confirm that suspicion. As support for this proposition, the Commissioner relies primarily on *Whitfield v. Roth,* 10 Cal.3d 874, 112 Cal. Rptr. 540, 519 P.2d 588 (1974).

The plaintiff in *Whitfield,* a minor named Mary Katherine Whitfield, fell victim to a heart-wrenching series of medical mis-diagnoses before she was finally discovered to have a brain tumor. 10 Cal.3d at 877–881, 112 Cal.Rptr. 540, 519 P.2d 588. Mary underwent surgery to remove her tumor on July 10, 1964 but suffered a stroke on July 22 during post-operative recovery and became totally paralyzed in both legs and in her right arm. *Id.* at 881, 112 Cal.Rptr. 540, 519 P.2d 588. Mary's mother attempted to obtain legal counsel, finally succeeded on February 9, 1965, and on March 24, 1965 filed suit against various doctors and hospitals who had examined or treated Mary. *Id.*

On October 19, 1965, Mary and her mother obtained, through pre-trial discovery, records from a County Hospital where Mary had been treated; those records revealed for the first time that a doctor at County Hospital had tentatively diagnosed a brain tumor and had recommended additional tests, that those tests were never performed, that Mary's mother was never informed of the tentative diagnosis, and that the County Hospital later represented that there was no indication of a tumor. *Id.* Exactly one month after obtaining the Hospital's records, Mary and her mother presented a claim to the County. *Id.* at 882, 112 Cal.Rptr. 540, 519 P.2d 588.

On appeal, the California Supreme Court held that the claim presented to the County was timely under the California Tort Claims Act, which at that time required a claim to be presented not later than 100 days after accrual. *Id.* at 883, 112 Cal.Rptr. 540, 519 P.2d 588. Although the Court recognized that Mary's mother was suspicious of some wrongdoing more than 100 days before presenting Mary's claim, the Court emphasized that it was through the discovery obtained on October 19, 1965 that Mary's mother learned the facts constituting the negligent cause of Mary's injury. *Id.* at 887–89, 112 Cal. Rptr. 540, 519 P.2d 588.

Because the *Whitfield* court held that Mary's claim accrued only when she obtained the County Hospital records in discovery, the Commissioner relies on *Whitfield* as support for his position here— namely, that his claims did not accrue until his investigation led to the Lion deposition in December 2001. But in the years since *Whitfield,* several California Supreme Court decisions have narrowed that case's holding. The Supreme Court has repeatedly explained that the discovery rule does not necessarily delay accrual until completion of a plaintiff's investigation but only until the plaintiff "has reason to suspect" wrongdoing—that is, until the plaintiff has "notice or information of circumstances to put a reasonable person *on inquiry.*" *Norgart,* 21 Cal.4th at 397, 87 Cal.Rptr.2d 453, 981 P.2d 79 (internal quotation marks omitted); *Jolly,* 44 Cal.3d at 1110–11, 245 Cal.Rptr. 658, 751 P.2d 923; *Gutierrez v. Mofid,* 39 Cal.3d 892, 896–7, 218 Cal.Rptr. 313, 705 P.2d 886 (1985); *Sanchez v. South Hoover Hospital,* 18 Cal.3d 93, 101, 132 Cal.Rptr. 657, 553 P.2d 1129 (1976). In *Gutierrez,* a medical malpractice case decided more than ten years after *Whitfield,* the California Supreme Court held that the limitations period begins to run "when the patient's reasonably founded suspicions have been aroused, and she has actually become alerted to the

*necessity for investigation* and pursuit of her remedies." 38 Cal.3d at 897, 215 Cal. Rptr. 679, 701 P.2d 826 (emphasis added, internal quotation marks omitted). *See also Jolly*, 44 Cal.3d at 1111, 245 Cal.Rptr. 658, 751 P.2d 923 ("Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights.").

The California Supreme Court did cite *Whitfield* in a footnote to its *Jolly* opinion, but that footnote does not support the Commissioner's position that in this case accrual was delayed until December 2001. The *Jolly* court cited *Whitfield* only to distinguish it, explaining that *Jolly* did not present a case "where the plaintiff conducted a prompt investigation and brought suit as soon as the results of the investigation were known, but even so filed her claim after the limitations period had expired." *Jolly*, 44 Cal.3d at 1113 n. 11, 245 Cal.Rptr. 658, 751 P.2d 923. In such a case, the *Jolly* court stated, "the cause of action might still be timely." *Id.* (citing *Whitfield*, 10 Cal.3d 874, 887–889, 112 Cal.Rptr. 540, 519 P.2d 588).

Assuming that the California Supreme Court would expressly adopt this narrowed interpretation of *Whitfield* as an exception to the standard discovery rule, and also assuming that in principle the *Whitfield* exception could be applied to this fraud case, instead of being limited to the Tort Claims Act's very short limitations period, the facts of this case do not fall within the *Whitfield* exception as clarified by *Jolly's* footnote 11. Although the Commissioner may have conducted a "prompt investigation," he did not file suit "as soon as the results of the investigation were known."

*Jolly*, 44 Cal.3d at 1113, n. 11, 245 Cal. Rptr. 658, 751 P.2d 923. Far from it. The Commissioner claims to have made his critical discoveries in December 2001, but he did not file this suit until July 31, 2002—more than seven months later. *Cf. Whitfield*, 10 Cal.3d at 881, 112 Cal.Rptr. 540, 519 P.2d 588 (plaintiff filed suit one month after discovery). In light of such a lengthy and unexplained delay, the Commissioner cannot qualify for the *Whitfield* exception to the discovery rule.

## IV. Fraudulent Concealment

■■■■ As his next basis for avoiding the bar of the statute, the Commissioner invokes the fraudulent concealment doctrine, which has been described as a "close cousin" to the discovery rule. *Bernson v. Browning–Ferris Industries of California, Inc.*, 7 Cal.4th 926, 931, 30 Cal.Rptr.2d 440, 873 P.2d 613 (1994). Succinctly stated, the rule of fraudulent concealment provides that a "defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations." *Id.* (quoting *Sanchez v. South Hoover Hospital*, 18 Cal.3d 93, 99, 132 Cal.Rptr. 657, 553 P.2d 1129 (1976)). This rule serves an obvious equitable purpose: it prevents "the culpable defendant ... from profiting by his own wrong to the extent that it hindered an 'otherwise diligent' plaintiff in discovering his cause of action." *Id.* (quoting *Sanchez*, 18 Cal.3d at 100, 132 Cal.Rptr. 657, 553 P.2d 1129).

As evidence of concealment in this case, the Commissioner points to alleged misrepresentations about Defendant Lacharriere's involvement in the ELIC fraud made by Jean–Francois Henin (a defendant in the *Altus* litigation) and by Alain Mallart (a co-defendant in this case).[12] Fontana

---

12. Mallart's American and French counsel both object vehemently to Mr. Fontana's references to their conversations, arguing that Mr. Fontana intentionally violated assurances of confidentiality he had given them pursuant to and in compliance with French law. Flu-

menbaum Reply Decl. Exhs. 1, 2. One of Mallart's attorneys disputes that Fontana was told what he claims to have been told. *Id.* Exh. 2. The Court makes no finding as to what, if anything, Mallart or his counsel may have said, but since the Commissioner relies

Decl. ¶¶ 26–32. The Commissioner contends that at various times between August 1999 and August 2000 Henin denied Lacharriere's involvement in the fraud and that at various times between December 2000 and December 2001 Mallart falsely stated he had "no information" about Lacharriere's involvement. In reply, Lacharriere points out that these allegations are found nowhere in the Commissioner's complaint and also argues that the statements of third parties such as Henin and Mallart cannot toll the statute as to Lacharriere.

■ Even assuming that the misrepresentations attributed to Henin and Mallart could toll the statute against Lacharriere, however, the Commissioner's fraudulent concealment argument fails for a different reason. Although a culpable defendant cannot be permitted to benefit from intentional concealment, any period of equitable tolling will come to an end once the plaintiff has, or should have, notice of his claim. *Bernson,* 7 Cal.4th at 931, 30 Cal.Rptr.2d 440, 873 P.2d 613 ("[T]he defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it.") (quoting *Sanchez,* 18 Cal.3d at 99, 132 Cal.Rptr. 657, 553 P.2d 1129). *See also California Sansome Co. v. U.S. Gypsum,* 55 F.3d 1402, 1409 n. 12 (9th Cir. 1995); *Migliori v. Boeing North American, Inc.,* 114 F.Supp.2d 976, 983–84 (C.D.Cal.2000). In this case, the Commissioner had actual notice of his claims by not later than July 15, 1999.

### A. Notice and the Fraudulent Concealment Doctrine

As explained above, the Commissioner's claims accrued when the Commissioner

was put on inquiry notice—that is, when he became suspicious of, and began to investigate, all members of the MAAF-led investor group. But mere inquiry notice will not necessarily end a period of equitable tolling arising out of the defendant's fraudulent concealment. *See Migliori,* 114 F.Supp.2d at 983–85. *See also Hobson v. Wilson,* 737 F.2d 1, 25 (D.C.Cir.1984), *overruled in part on other grounds, Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), *cited with approval in Rita M. v. Roman Catholic Archbishop of Los Angeles,* 187 Cal.App.3d 1453, 1460, 232 Cal.Rptr. 685 (1986).

■ When intentional concealment tolls a statute of limitations, something closer to actual notice than mere inquiry notice is required to end the tolling period. *Migliori,* 114 F.Supp.2d at 983–85; *Riddell v. Riddell Washington Corp.,* 866 F.2d 1480, 1494–95 (D.C.Cir.1989). For example, if a diligent plaintiff is put off track by a defendant's efforts to conceal his or her identity, then the limitations period will be tolled until the plaintiff discovers the defendant's identity. *Bernson,* 7 Cal.4th at 936, 30 Cal.Rptr.2d 440, 873 P.2d 613. This is true even though knowledge of a defendant's identity is not necessary to put a plaintiff on *inquiry notice* of her claim. *See Norgart,* 21 Cal.4th at 399, 87 Cal. Rptr.2d 453, 981 P.2d 79 ("[F]ailure to discover, or have reason to discover, the identity of the defendant does not postpone the *accrual* of a cause of action ...."￼) (emphasis added). Similarly, if a plaintiff suspects that she has been wronged but does not know the specific facts that constitute the wrong, the statute may be tolled until she learns of those facts if the defendant takes steps to conceal them. *See, e.g., Migliori,* 114

---

so heavily on his claim that Mallart lulled him into not discovering Lacharriere's conduct, it

is necessary to note the basis for that contention.

F.Supp.2d at 985–86. Again, this is true even if the plaintiff is already on inquiry notice as to her claim. *Id.* at 982–83.

Although few courts have considered in detail the difference between "inquiry notice" and the near-actual type of notice sufficient to end a period of equitable tolling, the D.C. Circuit Court of Appeals offered the following explanation in *Hobson:*

> By "notice," we refer to an awareness of sufficient facts to identify a particular cause of action, be it a tort, a constitutional violation or a claim of fraud. We do not mean the kind of notice—based on hints, suspicions, hunches or rumors—that requires a plaintiff to make inquiries in the exercise of due diligence, but not to file suit.

737 F.2d at 35. No California court appears explicitly to have adopted this formulation, but the California Court of Appeal has cited *Hobson* approvingly, *Rita M.,* 187 Cal.App.3d at 1460, 232 Cal.Rptr. 685, and the *Hobson* standard is consistent with language in both state and federal cases applying California's fraudulent concealment doctrine. *See Bernson,* 7 Cal.4th at 931, 30 Cal.Rptr.2d 440, 873 P.2d 613 (fraudulent concealment tolls statute until plaintiff discovers his "claim"); *Pashley v. Pacific Electric Co.,* 25 Cal.2d 226, 229, 153 P.2d 325 (1944) ("[W]hen the defendant is guilty of fraudulent concealment ... the statute is deemed not to become operative until the aggrieved party discovers the existence of *the cause of action.*") (emphasis added).

### B. The Commissioner Had Actual Notice by July 15, 1999

In this case, it is clear that while the Commissioner may only have been on inquiry notice as of June 1998, he was on actual notice as to his "particular cause of action" by no later than July 15, 1999. By that date, the Commissioner was not only suspicious of Lacharriere but had actually obtained evidence that confirmed his suspicion. Specifically, the Commissioner obtained through discovery a letter written by Patricia Barbizet of Artemis stating that: (1) Altus financed Finapaci's purchase of Aurora shares "within the framework of the 'portage'"; (2) Aurora's shares were "held in portage by four investors (Omnium, MAAF, SDI Vendome and Finapaci)"; and (3) Finapaci's acquisition of Aurora shares "amounted to an internal operation of Credit Lyonnais." Barbizet Letter, attached as Exh. A to Lacharriere's July 2, 2003 Submission. *See also* LeVine Dep. at 204:9–207:9, 219:3–221:15 (attached as Exh. 3 to the Flumenbaum Reply Decl.). This information put the Commissioner on notice as to the specific facts underlying his claim against Lacharriere: namely, that Lacharriere's representations to the Commissioner in the early 1990s—representations that Lacharriere, through his company Finapaci, was an "independent investor"—were materially false.[13]

---

**13.** At oral argument, the Commissioner argued that the Court has chosen one permissible interpretation of the Barbizet letter even though the Commissioner might reasonably have understood the letter to have a different meaning at the time of its discovery. As an example, the Commissioner contends that the French term *"portage"* need not always refer to secret fronting agreements like those alleged in this case.

The Court is not persuaded. Even at oral argument the Commissioner failed to elaborate any "innocent" inference that the Commissioner could have drawn from the Barbizet letter. The gravamen of the Commissioner's claim against Lacharriere is that Lacharriere lied to the DOI when he represented that he, through his company Finapaci, would be an "independent" investor. Whatever ambiguities might inhere in the term "portage," the Commissioner cannot deny that the *"portage"* agreement referred to in the Barbizet letter is obviously some type of agreed-to business relationship. *See* Barbizet Letter. *Cf. also* Altus

Because the Barbizet letter revealed Finapaci to be an Altus/Credit Lyonnais *porteur*, its discovery put the Commissioner on notice of his claim and brought any tolling period to an end. Henin and Mallart may have continued to deny Lacharriere's involvement, but once the Commissioner was on notice of his cause of action, their supposed protestations of Lacharriere's innocence could no longer toll the statute. *Silver v. Watson*, 26 Cal.App.3d 905, 911, 103 Cal.Rptr. 576 (1972) (once a plaintiff is on notice, later "assertions of innocence ... cannot be regarded as concealment") (internal quotation marks omitted). Indeed, the Commissioner's repeated allegations directed against all members of the MAAF-led investor group, sometimes specifically mentioning Lacharriere and his company Finapaci, *see* Timeline, *supra*, ¶¶ 9–10, ¶¶ 12–13, undercut any claim that he relied on the Henin and Mallart statements to delay filing suit. *See Mills v. Forestex Co.*, 108 Cal.App.4th 625, 652–656, 134 Cal.Rptr.2d 273 (2003) (defendant will not be estopped from asserting the statute of limitations as a defense where plaintiff could not reasonably have relied on defendant's false promises); *Stalberg v. Western Title Ins. Co.*, 27 Cal. App.4th 925, 931, 32 Cal.Rptr.2d 750 (1994) (a defendant's misrepresentations will not toll the statute when a plaintiff, already on notice of his claim, could not reasonably have relied on them).[14]

At the hearing on this motion, the Commissioner argued strenuously that the above analysis cannot be correct in light of the California Supreme Court's decision in *Bernson*. The Court has reviewed *Bernson* carefully. It does not save the Commissioner's claims.

*Bernson* was a libel case. The plaintiff, a Los Angeles city councilman, learned in 1988 that he was the subject of a "highly critical" report circulating among members of the Los Angeles media. 7 Cal.4th at 929, 30 Cal.Rptr.2d 440, 873 P.2d 613. Bernson managed to obtain a copy of the report, which charged him with misuse of city and campaign funds, but he was at first unable to identify who had prepared it. *Id.* On February 6, 1990, two Los Angeles Times reporters told Bernson that they believed the dossier had been prepared by Browning–Ferris Industries of California, Inc. ("BFI"), but counsel for BFI vehemently denied BFI's responsibility when confronted. *Id.* Accepting BFI's denial, Bernson allegedly remained in the dark until May 1991, when another Los Angeles Times reporter told him that an independent political consultant had prepared the report on behalf BFI. *Id.* With this new information in hand, Bernson decided that BFI's earlier denial must have been false, and he

---

FAC ¶ 18 (filed June 18, 1999) (using the term *"contrat de portage"* to describe the secret agreements at issue in this case). Nor can the Commissioner deny that Barbizet's use of the word *"portage"*—particularly when taken together with Barbizet's other statements (*e.g.*, that Finapaci had "an agreement" with Altus and that Finapaci's purchase of New California shares amounted to an "internal operation" of Credit Lyonnais)—exposes Lacharriere's claim of independence as false by revealing that Finapaci purchased shares in New California not as an independent investor but instead as part of an agreement with Altus.

14. The Commissioner's December 2001 discoveries may have provided additional support for his case against Lacharriere, but even then the Commissioner did not act quickly to file suit. *See Mills*, 108 Cal.App.4th at 655, 134 Cal.Rptr.2d 273 ("If there is still ample time to institute the action within the statutory period after the circumstances inducing delay have ceased to operate, the plaintiff who failed to do so cannot claim an estoppel.") (quoting *Lobrovich v. Georgison*, 144 Cal.App.2d 567, 573–74, 301 P.2d 460 (1956)).

filed suit against BFI, the political consultants who prepared the report, and the BFI employee who commissioned it *Id.* at 929–30, 30 Cal.Rptr.2d 440, 873 P.2d 613.

The trial court sustained one defendant's demurrer on the basis of the statute of limitations and later granted summary judgment in favor of the remaining defendants on the same ground. *Id.* at 930, 30 Cal.Rptr.2d 440, 873 P.2d 613. The Supreme Court reversed and remanded, explaining that a diligent plaintiff who remains "totally ignorant" of a defendant's identity may be entitled to toll the statute of limitations if his ignorance is the result of the defendant's fraudulent concealment. *Id.* at 937, 30 Cal.Rptr.2d 440, 873 P.2d 613. The Supreme Court emphasized that a plaintiff invoking the equitable tolling doctrine must prove his diligence and that the limitations period would only be tolled until the diligent plaintiff discovered, or should have discovered, the defendant's identity. *Id.* at 936, 30 Cal.Rptr.2d 440, 873 P.2d 613. Noting that the trial court had issued no statement of decision or findings of fact, however, the Supreme Court in *Bernson* remanded for further consideration of whether the defendants actions constituted concealment, whether their actions actually deprived Bernson of knowledge of defendants' identity, and whether Bernson exercised due diligence.

*Id.* at 937–38, 30 Cal.Rptr.2d 440, 873 P.2d 613.

■ The remand in *Bernson* does not require a ruling in the Commissioner's favor here. A plaintiff with "no knowledge" of a wrongdoer's identity will be entitled to equitable tolling only when he makes the "necessary showing of fraud." *Id.* at 936, 30 Cal.Rptr.2d 440, 873 P.2d 613 (quoting 3 Witkin, Cal. Procedure § 529 (3d ed.1985)). *See also id.* ("We agree in the main with Witkin."). Here, the Commissioner may have a strong case that a co-conspirator, Henin, lied to the Commissioner about Lacharriere's involvement even after the Commissioner had discovered the Barbizet letter. *Cf. Bernson*, 7 Cal.4th at 929, 30 Cal.Rptr.2d 440, 873 P.2d 613 (recounting the denials of BFI's counsel). But the Commissioner could not reasonably have relied, and, in fact, did not rely, on Henin's denials. *See* 5 Witkin, Summary of Cal. Law § 676 (9th ed. 1988 & 2003 Supp.) ("justifiable reliance" is an element of fraud). It is clear from the Commissioner's own pleadings that he never accepted or relied on Henin's statements.[15] In October 2000—after Henin's denials but before his December 2001 discoveries—the Commissioner represented to this Court, in opposition to defense motions to dismiss in *Altus*, that "Marc Ladreit de Lacharriere ... acted as a front [for Altus and Credit Lyonnais] in the ELIC transaction through his company [Finapaci]."[16] Com-

15. The Commissioner does not contend that co-conspirator Mallart ever denied Lacharriere's involvement. According to the Commissioner, Mallart simply stated that he had "no information" about the roles played by other investors. *See* Timeline, *supra*, ¶ 14. The Commissioner could not reasonably have relied on Mallart's claimed lack of knowledge to conclude affirmatively that Lacharriere was not involved in the fraud.

16. Even without the Commissioner's own statements as evidence that he never relied on Henin's denials, the Court doubts whether any rational juror could find such reliance reasonable. The Commissioner learned of

Lacharriere's fraud in a letter written by an employee of Artemis—a company that had been formed by Altus and Credit Lyonnais and that had actually purchased Lacharriere's company, Finapaci. *See supra* note 7. In *Bernson*, the plaintiff apparently first learned the identity of one defendant, BFI, from two Los Angeles Times reporters—individuals without any apparent first-hand knowledge of the truth or direct access to evidence. 7 Cal.4th at 929, 30 Cal.Rptr.2d 440, 873 P.2d 613. It may have been reasonable, in light of the source of his information, for Bernson to rely on BFI's subsequent denials, but it appears far less so for the Commissioner to have relied on Henin's representations—particular-

missioner's Opp. [to defense motions to dismiss in *Altus*] at 6:3–10 & n. 9 (attached as Exh. 11 to the Flumenbaum Decl.). Henin may have falsely denied Lacharriere's involvement at various times between August of 1999 and August of 2000, *see* Timeline, *supra*, ¶ 11, but those lies did not deprive the Commissioner, already in possession of the Barbizet letter, of knowledge of either Lacharriere's identity or his fraud. *Cf. Bernson*, 7 Cal.4th at 937–38, 30 Cal.Rptr.2d 440, 873 P.2d 613 (remanding for consideration of whether "defendants' actions : . deprived plaintiff, in fact, of knowledge of defendants' identity").

The Commissioner was on notice of his claim by at least July 15, 1999, and no fraudulent concealment tolled the statute beyond that date. As a result, the limitations period expired by not later than July 15, 2002—two weeks before the Commissioner filed suit.[17]

## CONCLUSION

For the foregoing reasons, the Court finds that the Commissioner's claims against Defendant Lacharriere are time-barred. Lacharriere's Motion for Summary Judgment is GRANTED and all claims against him are hereby DISMISSED. The Commissioner's request for additional time to conduct discovery, *see* Opp. at 24–25, is DENIED. The Commissioner has not set forth, in affidavit form, the specific facts he hopes to elicit from further discovery, has not shown that

the facts sought exist and has not shown that the sought-after facts are essential to resist Lacharriere's summary judgment motion. *See California v. Campbell*, 138 F.3d 772, 779 (9th Cir.1998).

**IT IS SO ORDERED.**

---

ly given that the Commissioner had already charged Henin with fraud in the original *Altus* complaint filed in state court on February 18, 1999.

17. The Commissioner's lawyer suggests, without specifically pressing the point, that because the Barbizet letter was produced in the form and language in which it was written—French—the date on which the Commissioner actually received notice was later. Fontana

Decl. ¶ 20 ("It took the Commissioner's staff well more than a year to review, translate and analyze *those documents.*") (emphasis added). That is a singularly unpersuasive fall-back argument. Not only does Mr. Fontana fail to specify when that document was translated and why it could not have been translated previously, the 153,000 plus documents to which he refers were not produced until August 2000, more than a year after the Barbizet letter was produced.